■ In the Matter of DANIELLE M., a Child Alleged to be Neglected. COMMISSIONER OF SOCIAL SERVICES OF THE CITY OF NEW YORK, Appellant; ALMANIE M., Respondent.—Order of the Family Court, Bronx County (Elrich Eastman, J.), entered on or about November 14, 1988, dismissing the petition alleging neglect, reversed, without costs, on the law and the facts, the petition reinstated and the matter remanded to the Family Court for a dispositional hearing.

Lynn Novick, a Department of Social Services caseworker, filed a report of suspected child abuse or mistreatment on June 29, 1988 when respondent Almanie M. refused to allow her to speak with Danielle M., a child now 15 years old. A caseworker from the Department's Special Services for Children, Amoad Adjepong, gave testimony before the Family Court that he met with the same resistance and, suspecting

respondent was hiding something, removed the child from her mother's custody with the aid of the police. Once alone with Mr. Adjepong in his car, Danielle, after being reassured her conversation would not be tape recorded or repeated to her mother, revealed that she was "really afraid of her mother" and stated her desire that he not "take her back there." According to his testimony, Danielle told of having been beaten on various occasions and showed him a scar on her left leg, said to be the result of having been beaten with an electrical cord. She told Mr. Adjepong that her mother believed that there was a conspiracy against her and had accused Danielle of being a part of that conspiracy and also of having been "brainwashed" by her maternal grandmother, Minnie Ellis. Danielle has been placed in the custody of Ms. Ellis pending the outcome of these proceedings.

At the hearing, Danielle testified in Chambers with counsel for all parties present because she was afraid to give testimony in front of her mother, stating that respondent became violent when angry. Danielle said that her mother had told her that the conspiracy started at the naval base in Long Beach and was the work of the Masons or some other national group which was trying to drive her crazy. She testified that her mother accused her of joining "the enemy" and asked when and how "they" approach Danielle and what "they" say. She told of being awakened in the middle of the night, during the few days she had been with respondent, and commanded to give a word-for-word recitation of a conversation Danielle had overheard in a store. She also told of being slapped twice in the face, the second blow knocking her to the bed, when she could not recall in sufficient detail a telephone conversation she had with Ms. Ellis, months before while still living in California. Danielle also stated that respondent had threatened to prevent her from ever seeing her grandmother or sisters again.

Minnie Ellis testified that, during the time respondent lived with her during the early 1970's, she had seen respondent strike her children. She testified that Danielle's sisters, Linda and Audrey, had told her of respondent's belief in the existence of a conspiracy against her. Ms. Ellis stated that when respondent came to her apartment to pick up some clothes, Danielle ran to her room and locked herself inside.

The governing statute in this case is section 1012 (f) of the Family Court Act which provides, in pertinent part:

"(f) 'Neglected child' means a child less than eighteen years of age

"(i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care * * *

"(B) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment * * * or by any other acts of a similarly serious nature requiring the aid of the court".

The Family Court focused on the physical harm actually done to the child by respondent and held that "no corroborating evidence of excessive corporal punishment has been adduced to rise to the statutory level to constitute neglect." It noted that, with the exception of a three-year-old scar on Danielle's leg, there was no medical indication of physical abuse and held that her statements, standing alone, were insufficient to support a finding of physical abuse. On the question of emotional impairment, the court noted that no psychiatric evidence was presented to show that respondent suffers from paranoia. The court concluded that a finding of neglect against a mother "should be made only when established by a clear preponderance of the credible evidence."

At issue in this matter is not solely whether Danielle has been physically abused, but the "substantial risk" that the child's "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired" whether as the result of "excessive corporal punishment * * * or by any acts of a similarly serious nature requiring the aid of the court" (Family Ct Act § 1012 [f] [i]; *Matter of Daniel C.,* 47 AD2d 160, 163-164). The evidence adduced at the hearing indicates that respondent has engaged in some rather bizarre behavior, including unprovoked assault upon her daughter which cannot be regarded as "punishment" because administered in the absence of any misbehavior. Therefore, the appropriate inquiry is not whether it is excessive, but whether it constitutes conduct towards the child "requiring the aid of the court" (Family Ct Act § 1012 [f] [i] [B]).

The absence of physical injury is not dispositive *(Matter of Tammie Z.,* 105 AD2d 463, 464, *affd* 66 NY2d 1). The fear which respondent's unpredictable conduct has instilled in Danielle together with respondent's potential for violence represent an imminent danger of impairment of both the child's emotional and physical condition. Pursuant to the

statute, the operative criteria are the threat to the child's well-being, not the formal diagnosis of the condition from which that threat emanates, and the potential for harm to the physical and emotional condition of the child, not the mental health of the respondent.

The proof with respect to the psychiatric condition of the respondent must be evaluated in terms of the nature of the proceeding before the court. Mental impairment may be grounds for termination of parental rights based upon a finding that a parent is unable to care for her child (Social Services Law § 384-b [4] [c]; *Matter of Edward R.,* 123 AD2d 866). However, the United States Supreme Court has stated, "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence" *(Santosky v Kramer,* 455 US 745, 747-748). By contrast, a proceeding under article 10 of the Family Court Act results not in the termination of parental rights, but merely in the temporary placement of the child (Family Ct Act § 1055 [b] [i]; *Matter of Tammie Z.,* 66 NY2d 1, *supra).* In the context of such a proceeding, the paramount concern, as the Court of Appeals has stated it, is that "an erroneous failure to place the child may have disastrous consequences" (66 NY2d 1, 4-5, *supra).* Therefore, the absence of a diagnosed condition does not preclude a finding of neglect, and where the preponderance of the evidence indicates a likelihood that the child's physical, mental or emotional condition will be impaired, such a finding is warranted.

On the matter of corroboration, the sworn testimony of the child at the hearing may stand alone as competent evidence of abuse, as may unsworn testimony *(see, Matter of Elizabeth D.,* 139 AD2d 66). It must be emphasized that, even in an appropriate instance, corroboration is required not because the testimony of a child is inherently unreliable, but because the statements within the contemplation of the applicable statutory provision constitutes hearsay (Family Ct Act § 1046 [a] [vi]; *Matter of Nicole V.,* 71 NY2d 112, 118). Moreover, in the matter before us, Danielle's testimony serves as sufficient corroboration of her out-of-court statements attested by Minnie Ellis and Amoad Adjepong *(Matter of Tawana D.,* 139 AD2d 736). Concur—Kupferman, J. P., Carro and Rubin, JJ.

Asch and Smith, JJ., dissent in a memorandum by Smith, J., as follows: I agree with the Family Court that the evidence did not support a finding of neglect and I would affirm the judgment.

The petition against the respondent mother charged her as follows:

"DANNIELLE * * * is a neglected child less than eighteen years of age whose physical mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of her mother to exercise a minimum degree of care in providing the child with proper supervision or guardianship by inflicting excessive corporal punishment and by other acts of a similarly serious nature requiring the aid of the court in that:

"1. Ms. M * * * has been acting in a paranoid fashion believing that there is a conspiracy against her. She slapped DANNIELLE for sneezing stating that sneezing shows that DANNIELLE is part of the conspiracy against her.

"2. Ms. M * * * has beaten DANNIELLE with an extension cord and belt all over her body DANNIELLE is afraid of her mother.

"3. Ms. M * * * used to beat her other children now grown with an extension cord while they were naked."

There were four witnesses at the hearing, Amoad Adjepong of Special Services for Children of the New York City Department of Social Services; the child Danielle M.; the child's mother, the respondent Almanie M.; and the child's grandmother, Ms. Ellis. Although three of the witnesses testified about corporal punishment, the source for all of their testimony was Danielle M.

The background of the case is as follows:

Respondent was employed in California by the United States Navy for 10 years and left this employment in 1981. Respondent claims that as a result of negative references provided by the Navy, she has been unable to obtain subsequent employment. In late 1987, respondent left Danielle in California in the care of a 29-year-old daughter and came to New York to find work. Respondent testified that the arrangement with her daughters was that Danielle would join respondent in New York at the conclusion of the school term.

In June 1988 respondent was homeless and contacted the Westchester County Department of Social Services. The child maltreatment report, filed on June 29, 1988 by Ms. Lynn Novick of the homeless casework unit of that Department, indicates that respondent first contacted them on June 14, 1988 and that she had arranged to have Danielle come to her in New York so that respondent could be sent to an apartment rather than to a homeless shelter.

On June 26, 1988 Danielle joined respondent in New York. The following day the Department provided respondent and the child with temporary housing at the Oasis Motel in The Bronx. However, respondent refused to speak with Ms. Novick or to allow Danielle to speak with her. Two days later Novick filed the above-mentioned report of suspected child mistreatment.

The case was assigned to Amoad Adjepong of Special Services for Children who contacted Almanie by telephone at the motel and arranged to meet with her there the following day. When respondent refused to speak with Mr. Adjepong or to allow Danielle to speak with him, Adjepong enlisted the aid of the police to remove Danielle from her mother's custody. The child was placed with her maternal grandmother, Ms. Ellis.

Mr. Adjepong was questioned on cross-examination as to why he removed the child from her mother. His testimony was as follows:

"Q. Mr. Adjepong, do you believe the child was in imminent danger on the day that you removed her?

"MR. MAXWELL: Objection.

"THE COURT: I'll allow it. * * *

"THE COURT: Did you remove the child?

"THE WITNESS: Yes, I did.

"THE COURT: Well, did you remove the child? That's what he's asking you; your basis for the removal. * * *

"THE WITNESS: I had already spoken to the source, at DSS. The worker had told me that she wanted to speak to Danielle, and the mother wouldn't allow her to speak to her.

"When I went there, she showed the same attitude. She wouldn't talk to me. I had to believe, at that time, she was hiding something from me. I wanted to know why she didn't want to talk to me, and she didn't want Danielle to talk to me.

"THE COURT: On that basis, you removed the child; right?

"THE WITNESS: Yes."

Mr. Adjepong testified that in his car, on route to Ms. Ellis's home, Danielle first questioned him as to whether there was a tape recorder operating in the car and then confided that she was afraid of her mother. The child told Mr. Adjepong that respondent had beaten her on various occasions, once scarring her left leg, and showed Mr. Adjepong the scar. She further described certain bizarre behavior by her mother during the past few days, including respondent's accusing the child of

conspiring against respondent merely because the child had sneezed, respondent's use of obscene language and screaming.

At the hearing Mr. Adjepong, who had had several in-person and telephone conversations with Danielle, recommended that the child receive counseling.

Danielle, age 15, indicated that she was afraid to speak in front of her mother and was permitted by the court to testify in Chambers with all counsel present. She testified that she feared her mother who became violent when angry, stating "her eyes get big and she gets a mean look on her face. Then she is ready to fight. She is just violent." She told the court of an incident at the motel in which "I happened to sneeze in the morning, and she [my mother] got up in an uprage [sic]. She thought I was part of a conspiracy when I sneezed." Danielle testified that when she could not remember the exact words of a conversation she had had with her grandmother several months earlier, respondent slapped her twice on her face, the second blow knocking her to the bed. She testified that on another occasion at the motel respondent, at 1:00 A.M., demanded that Danielle describe a conversation which Danielle had had with a friend. The child indicated that her mother had frequently spoken about a conspiracy against her and believed that it was the work of the Masons or some other "nationwide" group. Danielle also testified as to a permanent scar on her lower right leg caused by a beating from her mother three years earlier.

Danielle M. testified further that her mother had inflicted the scar on her leg when her mother beat her after the key to her school locker had been stolen, her mother believing that Danielle had lost it. Danielle also stated that her mother had not beaten her since she was 12 or 13 years old, some three years prior to the hearing. In addition, she had never seen her mother beat her sisters who were approximately 14 or 15 years older than Danielle.

Ms. Ellis indicated that Danielle told her that her mother "flung" her on the bed and threatened her when Danielle failed to recall a phone conversation she had had with Ms. Ellis several weeks before; that when respondent Almanie lived with her in the 1970's, she observed respondent strike her children; and that the children had told her more than once that respondent believed that a conspiracy existed against her. She further indicated that she had observed scars on both Danielle and on another of respondent's children.

Almanie M. testified that she had struck Danielle only 3 or

4 times in her life, the last incident occurring in 1984 when she struck the child on her buttocks with a belt. She insisted that when she spoke with Mr. Adjepong by telephone on June 29, he stated "this is the Amo Department." Respondent appears to have continued with this position even after learning that Mr. Adjepong's first name is Amoad. Respondent admitted however, that Mr. Adjepong told her that he was with the Department of Social Services and that she refused to speak with him.

Family Court Act § 1012 (f) (i) (B) defines a neglected child, insofar as it is relevant here, as follows:

"(f) 'Neglected child' means a child less than eighteen years of age

"(i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care * * *

"(B) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment".

In dismissing the petition the Family Court stated the following:

"Reviewing the evidence here presented no corroborating evidence of excessive corporal punishment has been adduced to rise to the statutory level to constitute neglect. Other than a three year old scar on the child's leg, no other proof has been submitted to indicate that this child has been physically abused by her mother. Her testimony as to being beaten with extension cords all over her body is not supported by any of the evidence. No medical reports indicate severe beating nor are there scars over her body to substantiate this. Here presented and uncorroborated by the evidence are the statements of the child. Standing alone, this is not sufficient to make a finding of neglect for physical abuse. F.C.A. § 1046 (a) (vi).

"Moreover, this child was residing in California for six months with her sisters. No complaint of physical abuse has been indicated. Furthermore, she voluntarily came to her mother in New York upon her mother's request. Nothing in the evidence presented supports a finding a neglect by reason of excessive corporal punishment.

"With respect to the issue of emotional impairment, no

medical or psychiatric evidence has been presented to determine that this mother is suffering from the mental illness, paranoia. The testimony as to her preoccupation with being followed is not medically supported in the record to warrant a finding of emotional impairment. Clearly, there is conflict between the mother and this child that may warrant some family counselling. However, disputes or disagreements within a family [are] not sufficient to brand a parent neglectful unless the child's physical or emotional health is in imminent danger of either being impaired or it has been impaired. This is not established by this evidence.

"A finding of neglect against a mother is a serious matter and should be made only when established by a clear preponderance of the credible evidence.

"Accordingly, this Court finds that the petitioner has failed to establish neglect against this mother within the meaning of this statute. The petition is dismissed."

The appellants contend that the Family Court erred by requiring corroboration for the testimony of the child witness. This is not a fair reading of the court's decision. What the court stated was that it did not believe the testimony of the child witness since there was no physical evidence of any corporal punishment other than a three-year-old scar. Danielle herself testified that though her mother had slapped her on recent occasions, beatings had ended some three years before.

That there is conflict between mother and child is clear from this record. What has not been shown is that the mother neglected the child by excessive corporal punishment or in any other manner.