■ In the Matter of DAVID J. and Others, Children Alleged to be Neglected. SCHENECTADY COUNTY DEPARTMENT OF SOCIAL SERVICES, Appellant; ROSLYN K., Respondent. (And Another Related Proceeding.) [613 NYS2d 729] —Yesawich Jr., J. Appeal from an order of the Family Court of Schenectady County (Dawson, J.), entered January 20, 1993, which, *inter alia,* granted respondents' applications, in two proceedings pursuant to Family Court Act article 10, for an order directing petitioner to return their children to them.

Having received reports that respondents were not providing proper care for children in their household, David (age nine), Candice (age four), and Christine (age two), petitioner commenced these two proceedings to adjudicate the children neglected. Following respondents' failure to appear for a scheduled court appearance, and being apprised that the family had moved to Montana, Family Court ordered the children temporarily removed from respondents' custody. Petitioner brought the children back to New York and placed them in foster care. Respondents, having also come back to this State, applied pursuant to Family Court Act § 1028 to have the children returned to them. After a hearing, Family Court granted respondents' applications and ordered the children returned, subject to the terms of temporary orders of supervision and protection, which, *inter alia,* required respondents to grant petitioner access to their home and meet with petitioner's caseworkers, and prohibited removal of the children from the Capital District area without petitioner's prior consent. Petitioner appeals Family Court's order, which has been stayed pending this appeal.

To the extent relevant here, Family Court Act § 1028 provides that upon application of a parent, children that have been temporarily removed from the parents' custody are to be returned, unless doing so would create "an imminent risk to the child's life or health" (Family Ct Act § 1028; *see,* Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1028, at 334). Consequently, to defeat respondents' applications, petitioner must demonstrate that respondents are likely to act in a manner which runs counter to the children's best interests, and also that there is some possibility that respondents' conduct will endanger the children in the immediate future. The children's long-term needs are not an issue, for they will necessarily be addressed when the merits of the underlying neglect petitions are examined.

Much of the proof presented by petitioner, and relied upon by the dissent, while certainly providing some indication of respondents' overall parenting ability and judgment, does not bear on the issue at hand. While the behavior of respondent Steven K. may be "bizarre and rigidly controlling"—he admits being a very protective parent—Family Court found, and we agree, that playing games in which Candice is harnessed, punishing David (who respondents testified had a behavior problem) by keeping him in his room "a little bit too much" or even for "the majority of the day", and brushing Christine's teeth at midnight simply do not pose an imminent risk to the

children's lives or health. Even if fully credited, these allegations would not warrant denial of respondents' application. The problem with David's schooling appears to be temporary inasmuch as his mother, respondent Roslyn K. who expressed anguished impotence about the manner in which the school authorities dealt with her son, testified that she does not want to keep him out of school but merely to resolve her difficulties with the administration, and in any event poses no immediate risk to his well-being.

And as for the admission by Steven K. to a single episode of violence directed at David more than a year prior to the hearing, that incident was satisfactorily explained as having been an accident which occurred when he attempted to lift David over a shopping cart. The record evidence simply does not mandate a finding that either respondent is likely to subject any of the children to violence or excessive corporal punishment *(compare, Matter of Jennifer G.,* 105 AD2d 701, 702; *Matter of Bobby M.,* 103 AD2d 777, 778).

Although the dissenters find some of respondents' testimony "inherently unbelievable", we are of the view that the findings of Family Court, which, it should be noted, made a special point of declaring at the outset of its decision that it had "a unique opportunity to evaluate the demeanor and credibility of each witness", should be accorded due deference *(see, e.g., Matter of Swift v Swift,* 162 AD2d 784, 785). If this principle is to be treated as something more than a mere platitude, surely this is a case in which it should be implemented.

Where, as here, the evidence found in the written record is plainly subject to differing interpretations—notably, there was no testimony or other evidence presented that would establish that David was a "target child", and given the assertion that he had a history of inappropriately touching his sisters, his different treatment may well have been warranted—the observations of the nisi prius court take on singular significance. Admittedly, this is a close case, but after carefully reviewing the record, we are unable to say that Family Court erred in finding respondents' testimony more credible than that of petitioner's representative—much of which was hearsay repetition of statements made by David, who was not averse to telling untruths on occasion—or in finding respondents' explanations of the "shopping cart incident", and their reasons for carefully monitoring and limiting David's contact with the young girls, believable and reasonable.

Finally, we think the dissent places undue emphasis on the

possibility that respondents may again leave the State. Although this is a matter of some concern, it is worth noting that respondents testified that at the time the family moved to Montana they did not believe such a relocation was prohibited by the court order then in effect, which required only that petitioner be notified of any change in residence, and that they intended to give such notice as soon as the family had acquired an apartment. Viewed from this perspective, respondents' conduct furnishes no basis for assuming that they are likely to defy an order explicitly prohibiting any relocation outside the Capital District area made without petitioner's prior consent.

The only evidence tending to substantiate the presence of an imminent risk to the children's health consists of respondents' asserted failure to properly treat Candice's "lazy eye" and in not having Christine's carious teeth, apparently the product of "bottle rot", extracted. Although a parent's failure to follow a prescribed course of medical treatment can place a child at sufficient risk to require denial of an application brought under Family Court Act § 1028 (see, Matter of Richard W., 174 AD2d 821, 823), petitioner has not shown that respondents' lack of diligence in procuring new glasses for Candice or dental treatment for Christine creates an *imminent* risk to the children's health. Indeed, the family physician caring for Candice observed that respondents "take good care of the children". Given respondents' avowed intention to obtain proper glasses for Candice and dental care for Christine, we cannot say that Family Court erred in finding that returning the children to respondents' care will not place the children in imminent danger. Whatever uncertainty we have about this outcome is dispelled by the fact that the temporary orders of supervision and protection issued by Family Court will provide adequate protection for the children until disposition of the neglect petitions (see, Family Ct Act § 1028).

Mercure and Crew III, JJ., concur.

Peters, J. (dissenting). "Social experiments should not be conducted at the cost of the well-being of the children" (Matter of Jennifer G., 110 AD2d 801, 802). A review of the record makes it quite clear that in affirming Family Court and allowing the return of Candice, Christine and David to the custody of respondents, the Court is engaging in the functional equivalent of a social experiment which respondents, by their conduct, have shown will not serve to protect the interests of the children.

On June 6, 1992 petitioner charged respondents with ne-

glect. On June 25, 1992 at a hearing in which respondent Roslyn K. (hereinafter the mother) personally appeared, petitioner requested a temporary order of supervision. Family Court granted a temporary order of supervision which required, *inter alia,* that the mother allow access to the children's home by petitioner, that the mother and children meet with the caseworker and that she notify petitioner upon any change in her residence or employment. In spite of said order, on September 21, 1992 both respondents failed to appear in court, having left New York with their children and fled to Montana. The record reflects that petitioner investigated diligently in order to determine the location of the children. When an order of removal was entered by Family Court in New York, the children were taken into custody in Montana and eventually brought back to Schenectady County by a caseworker associated with petitioner. Respondents then returned to New York.

Upon their return, respondents requested a hearing pursuant to Family Court Act § 1028. The Judge who had presided over the case up until this point recused himself and a new Judge was assigned. Following completion of testimony, Family Court ordered return of the children to respondents and granted a temporary order of supervision and protection. The order provided, *inter alia,* that respondents were not to leave the Capital District area without advising petitioner before they left.

Family Court Act § 1028 specifically provides that a court must grant an application for return of the child "unless it finds that the return presents an imminent risk to the child's life or health". The statute further specifically requires as follows: "In determining whether temporary removal of the child is necessary to avoid imminent risk to the child's life or health, the court shall consider and determine in its order whether continuation in the child's home would be contrary to the best interests of the child and where appropriate, whether reasonable efforts were made prior to the date of the hearing to prevent or eliminate the need for removal of the child from the home and where appropriate, whether reasonable efforts were made after removal of the child to make it possible for the child to return home" *(id.).*

Here, the record reflects that reasonable efforts *were* made prior to the date of the hearing to prevent the need for removal of the children by the entry of an order of supervision. It is respondents themselves who willfully and intentionally failed to comply with the order of Family Court and

instead fled New York with their children. A review of the entire record reflects absolutely no evidence indicating why these parents would be likely to comply with the order entered by the second Family Court Judge after having failed to comply with the order entered by the first.

When questioned concerning removal of himself and the children to Montana, respondent Steven K. (hereinafter the father or stepfather) testified that "we sought to do what was or what appeared to be in the best interests of our children. And I speak for both of us, my wife and myself, when I say this." The father admitted that there was an order requiring that petitioner visit the home and that they left the State shortly before a scheduled home visit. When further questioned, the father stated that "we left on purpose * * * without providing notice, and our actions were deliberate". The admissions of respondents do not support the majority's conclusion that the temporary orders of supervision and protection issued by Family Court upon return of the children will provide adequate protection.

Candice and Christine, birth children of both respondents, suffer physical problems which require attention of medical professionals. The record is replete with evidence of respondents' refusal to follow the recommendations of the professionals who have attempted to treat the rotted teeth of Christine and the ophthalmological difficulties of Candice. However, it is the condition of young David, the birth child solely of the mother, that causes us the gravest concern.

A representative of petitioner who interviewed David advised that David described incidents of violence at the hands of his stepfather which included being thrown down the stairs and being hit with a belt. He further told the social worker that he would be placed in his room for up to eight days at a time and only allowed out for meals. As of the date of the hearing, October 22, 1992, the social worker testified that the child had neither attended school in New York since the beginning of the school year nor had the child attended school in Montana.

The stepfather testified that he was of the opinion that David had been sexually abused while in the custody of his maternal grandmother and that he had also engaged in inappropriate conduct with his sisters. For this reason, he says, David was isolated from his siblings, was put in his room for long periods of time and was prohibited from engaging in any physical contact with his siblings, including even hugging his

sisters. The stepfather further admitted striking the child with his hands and was unable to "recall" whether he had ever thrown the child down the stairs. He did admit picking him up off of a chair and trying to throw him over a shopping cart but stated that "because I have a weakness in my left arm due to a back injury, I was unable to get him as I wanted him, onto his feet, on the other side of the shopping cart * * * [a]nd he fell on the shopping cart". According to the stepfather, David was thrown over the shopping cart because he was not sitting in the location he had been told to sit in. Unlike the majority, we are not convinced that the stepfather satisfactorily explained this incident. The stepfather further admitted that while his daughters are permitted to play outside, David is never permitted to do so and is precluded from having any friends visit him in his home.

The stepfather also testified that when they enrolled David in school in New York, some difficulties arose as to the child's school participation. According to the stepfather, he made it clear to the school authorities that David was not to participate in rituals or holiday observances. For example, he "pulled" the child out of school on Valentine's Day. On the Monday following, upon returning to school, the child had a bunch of Valentine cards on his desk from classmates. The stepfather testified that this was an "apparent clear violation of our wishes and our way of raising him". He further described "interference with parental authority" by a teacher handing out chewing gum to the class. As a result of these and other difficulties, David was transferred to a different elementary school. Again, problems arose between the parents and the school and the child was therefore kept at home.

When the mother was asked about how often her son David is put in his room, she admitted that he "might be in his room a little bit too much". She admitted that she purposely kept David out of school because when he is in school she has no say over him and she does not feel that this is right. She described her disappointment with the bus driver and all school officials. Finally, she stated that she would not home school David because it was too difficult with the girls at home and would not send him to school because she did not feel that her problems had been resolved in the school setting. These incidents, all gleaned from the record, make it clear that David's stepfather has made David the target child in the family and that the mother has failed to take adequate steps to protect his well-being.

With respect to Candice and her behavior at the foster

home, which included barking and crawling around on her hands and knees and asking for food like a dog, the father explained on cross-examination as follows: "[S]he likes emulating her heroes. There is—we didn't have it on tape, but I used to read the book to her, Lady and the Tramp. She liked that story. They also both watched on TV and had me read the book to her One Hundred and One Dalmatians. She likes dogs and she at times wants to be a dog. Sometimes she has me put a leash on her. And sometimes we even walk around the neighborhood. We are waiting for somebody to report us to Child Protective, saying, look at what they are doing. But, I'm careful, so it doesn't raise any alarm, I am careful not to put any rope tightly around her neck, if we do play that way sometimes. Sometimes her sister will lead her around like that. Also she watches—sometimes she makes like she's a pig, from Charlotte's Web." Hence, we find the father's behavior toward his children to be both bizarre and rigidly controlling. The absence of a diagnosis does not make his conduct any less of a risk to the children's emotional health (see, Matter of Danielle M. [Almanie M.], 151 AD2d 240).

In further support thereof, a neighbor testified that for the first few months after respondents moved in, she was unaware that they had a boy but she often saw the two young female children. She also testified that at nighttime she heard David crying in his room and heard the young female children crying in the middle of the night and heard loud noises, "like somebody was falling down the stairs". When asked to describe why she believes a neighbor hears the children crying late at night, the mother proffered the following explanation: "I can attribute crying at 12 o'clock at night. Christine has problems with her teeth. She needs to get her teeth brushed. And we don't brush it like one, two, three, finish. She gets her teeth clean. We don't feel the dentist is as important as other people might be because we work on the children's teeth. Anyway, Christine's teeth hurt. But, they have to be brushed. And usually she gets really upset and falls asleep. That's why we do it at bedtime. And we don't do that every night, because it's too much to put her through every night. So, that's what the crying is."

We find this explanation, like much of respondents' testimony, inherently unbelievable. Mindful that this is not a case where parents, for religious reasons, have refused to provide necessary medical care or public education for their children (Matter of Hofbauer, 47 NY2d 648), we believe the evidence reveals that petitioner has met its burden of proving by a

preponderance of the credible evidence that the children's health remains at imminent risk (see, *Matter of Richard W.* *[Yozefa W.]*, 174 AD2d 821; *Matter of Darnell D. [Commissioner of Social Servs. of City of N. Y.—Yvonne D.]*, 139 AD2d 610).

As our colleagues recently stated in *Matter of Ann BB.* (202 AD2d 806, 807, quoting *Matter of Charles DD. [Bernard EE.]*, 163 AD2d 744, 747), " 'A parent's rights must be subordinate to the paramount purpose of the statute, which reflects the strong public policy of the State to protect a child's interest against an unwilling or inept discharge of parental responsibilities' ". Accordingly, the evidence presented convinces me that the "safer course" is to retain the children in foster care and ensure a prompt fact-finding hearing (see, *Matter of Jennifer G.*, 105 AD2d 701, 702; see also, *Matter of Bobby M.*, 103 AD2d 777).

Mikoll, J. P., concurs. Ordered that the order is affirmed, without costs.