OPINION OF THE COURT
Jasen, J.
This appeal involves the issue whether a child suffering from Hodgkin’s disease whose parents failed to follow the recommendation of an attending physician to have their child treated by radiation and chemotherapy, but, rather, placed their child under the care of physicians advocating nutritional or metabolic therapy, including injections of laetrile, is a "neglected child” within the meaning of section 1012 of the Family Court Act. This case does not involve the legality of the use of laetrile per se in this State inasmuch as neither party contends that a duly licensed New York physician may not administer laetrile to his or her own patients. Nor is this an action brought against a physician to test the validity of his determination to treat Hodgkin’s disease by prescribing *652 metabolic therapy and injections of laetrile. Rather, the issue presented for our determination is whether the parents of a child afflicted with Hodgkin’s disease have failed to exercise a minimum degree of care in supplying their child with adequate medical care by entrusting the child’s physical well-being to a duly licensed physician who advocates a treatment not widely embraced by the medical community.
The relevant facts are as follows: In October, 1977, Joseph Hofbauer, then a seven-year-old child, was diagnosed as suffering from Hodgkin’s disease,[1] a disease which is almost always fatal if left untreated. The then attending physician, Dr. Arthur Cohn, recommended that Joseph be seen by an oncologist or hematologist for further treatment which would have included radiation treatments and possibly chemotherapy, the conventional modes of treatment. Joseph’s parents, however, after making numerous inquiries, rejected Dr. Cohn’s advice and elected to take Joseph to Fairfield Medical Clinic in Jamaica where a course of nutritional or metabolic therapy, including injections of laetrile, was initiated.
Upon Joseph’s return home to Saratoga County in November, 1977, the instant neglect proceeding was commenced, pursuant to article 10 of the Family Court Act, upon the filing of a petition in Family Court by the Saratoga County Commissioner of Social Services. The petition alleged, in substance, that Joseph’s parents neglected their son by their failure to follow the advice of Dr. Cohn with respect to treatment and, instead, chose a course of treatment for Joseph in the form of nutritional therapy and laetrile. A preliminary hearing was held and the court, finding "that there exists the probability of neglect of [Joseph] by his parents,” ordered that Joseph be temporarily removed from the custody of his parents and placed in St. Peter’s Hospital in Albany.
Thereafter, Joseph’s parents made an application to have Joseph returned to their custody. A hearing was duly commenced in December, 1977, but the proceeding was suspended for six months when a stipulation was entered into by the parties returning Joseph to the custody and care of his parents, and authorizing Joseph to come under the care of Dr. *653 Michael Schachter, a physician duly licensed in New York who is a proponent of metabolic therapy. The stipulation further provided that at least one other physician would be consulted regularly, with medical reports to be submitted to the court periodically.[2]
At the direction of the Appellate Division, a fact-finding hearing on the merits of this case was conducted by Family Court in June, 1978. A review of the testimony adduced at the hearing reveals a sharp conflict in medical opinion as to the effectiveness of the treatment being administered to Joseph. The physicians produced by appellants testified, in substance, that radiation and chemotherapy were the accepted methods of treating Hodgkin’s disease and that nutritional therapy was an inadequate and ineffective mode of treatment. In addition, two physicians, who by stipulation examined Joseph during the hearing, testified, in essence, that there had been a progression of the disease and denounced the treatment being rendered to Joseph as ineffective.
Two physicians produced by respondents, however, testified that they prescribed nutritional therapy for cancer patients and considered such therapy as a beneficial and effective mode of treatment, although they did not preclude the use of conventional therapy — radiation treatments and chemotherapy — in some cases. In addition, a biologist testified as to a study which had been conducted which demonstrated significant regression in cancerous tumors in mice which had been treated with amygdalin (laetrile), vitamin A, and proteolytic enzymes. Dr. Schachter, the attending physician, then testified that in his opinion Joseph was responding well to the nutritional therapy and that both his appetite and energy levels were good. Dr. Schachter further stated that he had consulted with numerous other physicians concerning Joseph’s treatment, and that he never ruled out the possibility of conventional treatment if the boy’s condition appeared to be deteriorating beyond control. Significantly, Joseph’s father also testi *654 tied that he would allow his son to be treated by conventional means if Dr. Schachter so advised. Both appellants’ and respondents’ witnesses testified as to the potentially dangerous side effects of radiation treatments and chemotherapy which could include, among other things, fibrosis of the body organs, swelling of the heart, impairment of the growth centers and leukemia.
Family Court, finding that Joseph’s mother and father are concerned and loving parents who have employed conscientious efforts to secure for their child a viable alternative of medical treatment administered by a duly licensed physician, found that Joseph was not a neglected child within the meaning of section 1012 of the Family Court Act and dismissed the petitions. On appeal, a unanimous Appellate Division affirmed. Leave to appeal to this court was granted by the Appellate Division. There should be an affirmance.
At the outset, we note that our scope of review is narrow in a case, such as this, coming to us with affirmed findings of fact. This is so because this court is without power to review the findings of fact if such findings are supported by evidence in the record. (Matter of Rochester Urban Renewal Agency [Patchen Post], 45 NY2d 1, 7; Matter of Rothko, 43 NY2d 305, 318; Simon v Electrospace Corp., 28 NY2d 136, 139; Matter of City of New York [Fifth Ave. Coach Lines], 22 NY2d 613, 620-621; St. Agnes Cemetery v State of New York, 3 NY2d 37, 40.) Thus, our review is confined solely to the legal issues raised by the parties. (CPLR 5501, subd [b].)
Our threshold task in this case is, by necessity, the identification of the standard of neglect against which the facts of this case may be measured. So far as is material for the issue under consideration, a neglected child is defined, by statute, to "[mean] a child less than eighteen years of age whose physical * * * condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent * * * to exercise a minimum degree of care in supplying the child with adequate * * * medical * * * care, though financially able to do so.”[3] (Family Ct Act, § 1012, subd [f], par [i], cl [A].)
A reading of this statutory provision makes it clear that the Legislature has imposed upon the parents of a child the *655 nondelegable affirmative duty to provide their child with adequate medical care. What constitutes adequate medical care, however, cannot be judged in a vacuum free from external influences, but, rather, each case must be decided on its own particular facts. In this regard, we deem certain factors significant in determining whether Joseph was afforded adequate medical care.
It is readily apparent that the phrase "adequate medical care” does not require a parent to beckon the assistance of a physician for every trifling affliction which a child may suffer for everyday experience teaches us that many of a child’s ills may be overcome by simple household nursing. We believe, however, that the statute does require a parent to entrust the child’s care to that of a physician when such course would be undertaken by an ordinarily prudent and loving parent, "solicitous for the welfare of his child and anxious to promote [the child’s] recovery.” (See People v Pierson, 176 NY 201, 206.) This obligation, however, is not without qualification.
It surely cannot be disputed that every parent has a fundamental right to rear its child. (Matter of Bennett v Jeffreys, 40 NY2d 543, 546; Quilloin v Walcott, 434 US 246, 255, reh den 435 US 918.) While this right is not absolute inasmuch as the State, as parens patriae, may intervene to ensure that a child’s health or welfare is not being seriously jeopardized by a parent’s fault or omission (see Wisconsin v Yoder, 406 US 205, 233-234; Prince v Massachusetts, 321 US 158, 166-167, reh den 321 US 804; Matter of Vasko, 238 App Div 128), great deference must be accorded a parent’s choice as to the mode of medical treatment to be undertaken and the physician selected to administer the same. As we have only recently stated, "[t]he filial bond is one of the strongest, yet most delicate, and most inviolable of all relationships.” (Matter of Corey L v Martin L, 45 NY2d 383, 392.)
In this regard, it is important to stress that a parent, in making the sensitive decision as to how the child should be treated, may rely upon the recommendations and competency of the attending physician if he or she is duly licensed to practice medicine in this State, for "[i]f a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment.” (Doe v Bolton, 410 US 179, 199, reh den 410 US 959.) Obviously, for all practical purposes, the average parent must rely upon the recommendations and competency of the attending physician since the *656 physician is both trained and in the best position to evaluate the medical needs of the child.
Ultimately, however, the most significant factor in determining whether a child is being deprived of adequate medical care, and, thus, a neglected child within the meaning of the statute, is whether the parents have provided an acceptable course of medical treatment for their child in light of all the surrounding circumstances. This inquiry cannot be posed in terms of whether the parent has made a "right” or a "wrong” decision, for the present state of the practice of medicine, despite its vast advances, very seldom permits such definitive conclusions. Nor can a court assume the role of a surrogate parent and establish as the objective criteria with which to evaluate a parent’s decision its own judgment as to the exact method or degree of medical treatment which should be provided, for such standard is fraught with subjectivity. Rather, in our view, the court’s inquiry should be whether the parents, once having sought accredited medical assistance and having been made aware of the seriousness of their child’s affliction and the possibility of cure if a certain mode of treatment is undertaken, have provided for their child a treatment which is recommended by their physician and which has not been totally rejected by all responsible medical authority.
With these considerations in mind and cognizant that the State has the burden of demonstrating neglect (see Matter of C. Children, 55 AD2d 646), we now examine the facts of this case. It is abundantly clear that this is not a case where the parents, for religious reasons, refused necessary medical procedures for their child (e.g., Matter of Sampson, 37 AD2d 668, affd 29 NY2d 900; Matter of Gregory S, 85 Misc 2d 846), nor is this a case where the parents have made an irreversible decision to deprive their child of a certain mode of treatment (Custody of a Minor, 379 NE2d 1053 [Mass]). Indeed, this is not a case where the child is receiving no medical treatment, for the record discloses that Joseph’s mother and father were concerned and loving parents who sought qualified medical assistance for their child.[4]
Rather, appellants predicate their charge of neglect upon the basis that Joseph’s parents have selected for their child a *657 mode of treatment which is inadequate and ineffective. Both courts below found, however — and we conclude that these findings are supported by the record — that numerous qualified doctors have been consulted by Dr. Schachter and have contributed to the child’s care; that the parents have both serious and justifiable concerns about the deleterious effects of radiation treatments and chemotherapy; that there is medical proof that the nutritional treatment being administered Joseph was controlling his condition and that such treatment is not as toxic as is the conventional treatment; and that conventional treatments will be administered to the child if his condition so warrants. In light of these affirmed findings of fact, we are unable to conclude, as a matter of law, that Joseph’s parents have not undertaken reasonable efforts to ensure that acceptable medical treatment is being provided their child.
By our decision today, we are by no means advocating the use of nutritional or metabolic therapy, including injections of laetrile, as a means to cure or control cancer, since this is not, in the context of this case, an issue for our resolution. (See, generally, Comment, Laetrile: Statutory and Constitutional Limitations on the Regulation of Ineffective Drugs, 127 U Pa L Rev 233, 249-252, and citations therein; 42 Fed Reg 39,768, 39,775-39,787 [1977].)[5] We decide only the issue presented in the context of the particular facts of this case as found by the courts below.[6]
*658 Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Cooke and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Meyer concur.
Order affirmed.

. Hodgkin’s disease is a "disease marked by chronic inflammatory enlargement of the lymph nodes, first the cervical and then the axillary, inguinal, mediastinal, mesenteric, etc., together with enlargement of the spleen, and often of the liver and kidneys, with lymphoid infiltration along the blood vessels; there is no pronounced leukocytosis.” (Stedman’s Medical Dictionary [19th ed].)

. In February, 1978, the New York Commissioners of Health and Social Services moved to intervene in the neglect proceeding. Although such motion was denied by Family Court, the Appellate Division reversed, and granted the motion to intervene. (61 AD2d 1102.) Thereafter, the interveners applied to vacate the stipulation and requested that a plenary hearing pursuant to article 10 of the Family Court Act be held immediately. The Family Court denied the requested relief and the Appellate Division affirmed such order (62 AD2d 508). The Appellate Division, however, did direct Family Court, immediately upon expiration of the stipulation, to proceed with the requisite "fact-finding” and dispositional hearing on the merits.

. It was stipulated by the parties that Joseph’s parents are financially able to provide medical care.

. We would note that it appears that no appropriate State agency has taken any disciplinary action against Dr. Schachter for his treatment of Joseph.

. It should be noted that the New York State Senate and Assembly have passed a bill now before the Governor which would expressly give patients, after consultation with their physicians, the right to decide whether to use amygdalin (laetrile). (S 1681-A, A 63-A, 202d Sess [1979].) This act provides, in substance, that no physician may be subjected to disciplinary action by any medical licensing board of this State or any private professional organization in this State for prescribing amygdalin (laetrile) to his or her patient if the patient consents in writing to such treatment after being fully informed that the substance is not an approved substance by certain delineated agencies (id., amdg Education Law, § 6527); that no duly licensed pharmacist shall be subject to any penalty or disciplinary action for dispensing, upon receipt of a prescription, amygdalin (laetrile) provided a label is affixed to the container which states that amygdalin has not been approved as a treatment for disease by the United States Food and Drug Administration (id., amdg Education Law, § 6812); and that no hospital or health-related institution shall prohibit the use of amygdalin (laetrile) when it is prescribed or administered by a duly licensed physician and requested by a patient (id., amdg Public Health Law, § 207).

. We recognize that the United States Supreme Court in United States v Rutherford (442 US —, 47 USLW 4724 [decided June 18, 1979]) has recently held that the "safety and effectiveness” standards of the Federal Food, Drug and Cosmetic Act do apply to terminally ill patients seeking to obtain drugs (including laetrile) which are not generally recognized as safe and effective. In our view, however, the narrow legal *658 issues faced by the court in Rutherford — limited only to the statutory authority of the Federal Government to ban laetrile from interstate commerce — have little bearing on the instant case.