*221 OPINION OF THE COURT
Chief Judge Wachtler.
In this case, an adult Jehovah’s Witness refused to consent to blood transfusions prior to delivery of her baby and persisted in the refusal after losing a substantial amount of blood following the Cesarean birth of the child. Based on her doctor’s affidavit that the transfusions were necessary to save her life, the Supreme Court in Suffolk County signed an order authorizing the hospital to give the transfusions over her personal objections. On application by the patient and her husband, the Appellate Division vacated the order. The hospital has now appealed to our court.[1]
The hospital recognizes that in this State a competent adult has the right to determine the course of his or her own medical treatment, and may decline even lifesaving measures, in the absence of a superior State interest. The hospital urges though that this is the exceptional case because it believes there are certain State interests present here which should prevail over the patient’s personal choice. The argument essentially is that the State has an overriding interest in preserving the life of a young, otherwise healthy person facing a risk of death which can be completely eliminated by a simple blood transfusion, and an even more substantial interest in protecting a minor child from the loss of the mother.
To place the issue in focus it is important to emphasize what this case does not involve.
First, the patient is an adult and not a child whose parents have refused to consent to necessary blood transfusions or other lifesaving measures. A court of this State clearly has the power and the obligation to order treatment essential to a child despite the parents’ conscientious objections (Matter of Storar, 52 NY2d 363, 380-381). Long ago the United States Supreme Court observed: "Parents may be free to become martyrs themselves. But it does not follow that they are free, in identical circumstances, to make martyrs of their children” (Prince v Massachusetts, 321 US 158, 170).
*222 Second, we are not dealing with an incompetent patient and thus are not called upon to decide whether the patient, when competent, made and expressed a firm resolve to forego the right to lifesaving treatment under particular circumstances. Here there is no question that the patient is a competent adult who made a conscious choice, for personal reasons, to avoid blood transfusions under all circumstances and that she never wavered in that commitment. The only question is whether the hospital and the court were bound to honor her choice so clearly expressed.
I.
The patient, Denise Nicoleau, is a practical nurse and her husband is a radiologist. Both are Jehovah’s Witnesses who believe that the biblical injunction to "abstain * * * from blood” (Acts 15:28-29) prohibits blood transfusions. When the patient became pregnant she consulted a physician practicing at Brookhaven Memorial Medical Center to provide prenatal care and deliver the child. The patient says that she informed the doctor that she was a Jehovah’s Witness and would not consent to a blood transfusion in connection with the delivery because that would violate her religious beliefs. On the form submitted before admission to the hospital she consented generally to medical procedures that may be necessary but specifically excluded "the administration of blood, pooled plasma or other derivatives.” Late in the pregnancy it was determined that the baby would have to be delivered by Cesarean section.
On December 29, 1988, the patient went into labor prematurely and was admitted to the hospital. That evening a Cesarean section was performed and a healthy baby boy was delivered. Following the delivery she began to hemorrhage and at approximately midnight it was determined that further surgery was necessary. She remained in surgery until about 4:00 a.m. Throughout the evening and early morning hours the patient had lost a substantial amount of blood and her doctor informed her that in his opinion she would die unless she had a transfusion. However, both she and her husband refused to consent to a transfusion on religious grounds. At the time she was 36 years old and, except for the loss of blood, apparently in good health.
When the doctor informed hospital officials of this situation they decided to seek a court order authorizing the transfu *223 sions. At about 9:00 a.m. that morning an attorney representing the hospital made the application to a Supreme Court Justice in Suffolk County. In support of the application the attending physician submitted an affidavit noting that the patient’s hemoglobin count had dropped to 4 which is far below the normal range of 12-14. The doctor stated that in his opinion "unless her medical condition improves (which I consider unlikely), she must have a blood transfusion in order to preserve her life.”
At about noon that day the court signed an ex parte order authorizing the hospital to administer "necessary blood transfusions” to the patient. The patient and her family received no advance notice of the application and no notice of the fact that the order had been signed until late in the afternoon. At about 6:00 p.m. that evening she received the first transfusion. Two days later the hospital gave her a second transfusion.
On January 2, the patient and her husband applied to the Appellate Division to vacate the order. In her supporting papers she indicated that her refusal to consent to blood transfusions was motivated not only by her religious beliefs but also by her concern for the dangers associated with transfusions, particularly the risk of contracting a communicable disease such as AIDS. She asserted that she had no desire to die and would accept medical treatments not involving transfusions, which she claimed were also effective in combatting blood loss. She argued that compelling her to submit to blood transfusions under these circumstances violated her common-law, statutory and constitutional right to make her own medical decisions as well as her constitutional right to practice her religion free of government interference. She urged that there were no identifiable State interests sufficient to overcome these rights.
The Appellate Division vacated the order by a divided court. The majority held that the Supreme Court erred in ordering the transfusions without giving the patient or her family notice and an opportunity to be heard before the order was signed and compounded the error by not providing that they be notified that the order had been signed so that they could seek prompt review before the transfusions were given. On the merits the majority held that the State had an interest in preserving her life but that there was no showing that this could only be accomplished by a blood transfusion since there was no proof in the record that nonblood medical treatments *224 would not have been successful. It also held that the State had an interest in protecting the child from the loss of parental support and care but that this interest would be satisfied by the father and the child’s extended family. The concurring Justice urged that the State had a compelling interest in preserving the patient’s life for the benefit of her child but agreed that the order should be vacated because it was issued without notice or an opportunity to be heard.
On this appeal the hospital argues that a patient’s right to decline lifesaving treatment should be limited to cases where the patient has a terminal or degenerative disease. When the patient is otherwise healthy the State has a stronger interest in preserving life, which should be held to outweigh the patient’s choice. The State’s interest is even stronger, the hospital contends, when the patient is a parent, and that the Appellate Division erred in adopting a "one-parent rule.” The argument here is that it is always in the child’s best interest to have two parents and that the State will intervene to protect the child’s welfare. Finally it is urged that the Appellate Division also erred in requiring notice and a hearing whenever a hospital applies for an order in these "emergency” cases because the delay may cause an additional risk to the patient’s life, particularly if the court is required to determine the child’s best interests under a "one-parent rule” which may require an extensive inquiry similar to a custody hearing.
II.
Initially, we note our agreement with the Appellate Division’s conclusion that in this case the Supreme Court should not have signed the order ex parte, without giving the patient or her husband notice and an opportunity to be heard. Applications for court-ordered medical treatment affect important rights of the patients and should generally comply with due process requirements of notice and the right to be heard before the order is signed (Rivers v Katz, 67 NY2d 485). We recognize that due process is a flexible concept and there may be cases in which the patient’s condition is so grave that there is no opportunity for prior notice and a hearing. Even then it would seem that the court should make some effort to communicate with the patient or responsible relatives if only to give prompt notice that the order has been signed. In this case, however, the record does not disclose any such exigency. In addition, the patient’s medical file recorded a long-standing unequivocal personal decision to decline transfusions. Appar *225 ently three hours elapsed between the time the application was made and the time the order was signed and an additional six hours passed before it was executed. Thus there was ample time to provide notice and an opportunity for a hearing, however informal.
It should be emphasized that it is not always necessary for a doctor or a hospital to obtain a court order before providing treatment to a patient in an emergency. If a patient in need of immediate medical attention is unconscious or otherwise unable to consent, the doctor may treat the condition under the emergency doctrine recognized at common law and by statute, which is based on the assumption that most persons would consent to treatment under these circumstances (Matter of Storar, supra, at 376). The emergency doctrine is inapplicable here, however, because the patient clearly stated before admission to the hospital and throughout her stay that she, would not consent to blood transfusions.
Although the patient’s competence is not in issue here we note, as we have in the past, that when there is a bona fide question of the patient’s competence the doctor or health care facility may seek a court ruling (see, e.g., Matter of Storar, supra). In such a proceeding the court should consider whether the patient has made a decision to decline the medical treatment, is fully aware of the consequences and alternatives, and is competent to make the choice. If the patient is not presently competent the court must determine whether there is clear and convincing evidence that the patient, when competent, made a firm resolve to decline treatment (Matter of Westchester County Med. Center [O'Connor], 72 NY2d 517).
III.
On the merits we have also concluded that the Supreme Court should not have ordered the blood transfusions in this case. The question as to whether this order violates the patient’s constitutional rights to religious freedom or to determine the course of her own medical treatment raises important and sensitive issues. However, they need not be resolved here because in our view the patient had a personal common-law and statutory right to decline the transfusions. Although this right is not absolute, and may have to yield to superior State interests under certain circumstances, the hospital has not identified any State interest which would override the patient’s rights under these circumstances.
*226 The common law of this State established the right of a competent adult to determine the course of his or her own medical treatment (Schloendorff v Society of N Y. Hosp., 211 NY 125, 129-130). This right has been adopted and preserved by the Legislature (Public Health Law §§ 2504, 2805-d). Although this rule was originally recognized in personal injury actions brought by patients against doctors for performing unauthorized acts, it has been held equally applicable in cases where doctors or hospitals seek a court order authorizing essential treatment (Matter of Storar, 52 NY2d 363, supra; Rivers v Katz, 67 NY2d 485; Matter of Westchester County Med. Center [O’Connor], supra). In those cases as well we reaffirmed the basic right of a competent adult to refuse treatment even when the treatment may be necessary to preserve the person’s life.
We have recently held that this "fundamental common-law right is coextensive with the patient’s liberty interest protected by the due process clause of our State Constitution” and that right could be overcome only by a compelling State interest (Rivers v Katz, supra, at 493). A constitutional analysis was necessary in Rivers v Katz to overcome a State regulation which we found to be unconstitutional. But, as noted, we need not reach the constitutional question here where no statute or regulation is involved and, as in Matter of Storar (supra), the patient’s right to refuse the transfusions may be sustained on the basis of the common-law and statutory rules alone. This common-law right also is not absolute and in some circumstances may have to yield to superior interests of the State. There is no question that the State can adopt compulsory vaccination laws to protect the public from the spread of disease (Jacobson v Massachusetts, 197 US 11), that it can order essential medical care for individuals who are incapable of making medical decisions (Jehovah’s Witnesses v King County Hosp., 390 US 598; cf., Matter of Storar, 52 NY2d 363, 380-381, supra) and that it can even prohibit medical procedures that pose a substantial risk to the patient alone (Matter of Storar, supra, at 377). But an identified State interest which conflicts with a patient’s choice will not always prevail. There are many cases where the State’s concern is not sufficient to override the individual’s right to determine the course of medical treatment as a patient (Rivers v Katz, supra, at 495, n 6) or as the parent of a patient (Matter of Hofbauer, 47 NY2d 648). In these and similar cases the courts have to weigh the interests of the individual against the interests *227 asserted on behalf of the State to strike an appropriate balance.
The threshold inquiry is whether there is an identifiable State interest in intervening in the patient’s medical choice. If there is, the inquiry must focus on whether the State’s interest is sufficiently substantial to outweigh the individual’s right. On this point, the extent to which the State has manifested its commitment to that interest through legislation or otherwise is a significant consideration.
The State has a well-recognized interest in protecting and preserving the lives of its citizens. However, we have previously upheld the right of a person to decline life-sustaining treatment against a claim that this is inconsistent with the State’s general interest in preserving the lives of its citizens (Matter of Eichner v Dillon, 52 NY2d 363, 377). In these instances, it has been noted, a distinction should be drawn between the State’s interest in protecting the lives of its citizens from injuries by third parties, and injuries resulting from the individual’s own actions (see, e.g., Public Health Trust v Wons, 541 So 2d 96, 98 [Fla 1989, Ehrlich, Ch. J., concurring]). When the individual’s conduct threatens injury to others, the State’s interest is manifest and the State can generally be expected to intervene. But the State rarely acts to protect individuals from themselves, indicating that the State’s interest is less substantial when there is little or no risk of direct injury to the public. This is consistent with the primary function of the State to preserve and promote liberty and the personal autonomy of the individual (Rivers v Katz, supra). In many if not most instances the State stays its hand and permits fully competent adults to engage in conduct or make personal decisions which pose risks to their lives or health. The State will intervene to prevent suicide (Penal Law § 35.10 [4], [5] [b]) or the self-inflicted injuries of the mentally deranged (Rivers v Katz, supra, at 495-496). But merely declining medical care, even essential treatment, is not considered a suicidal act or indication of incompetence (Matter of Storar, supra, at 377-378, n 6).[2] In the area of medical care we have noted that there is no statute requiring an individual to submit to medical treatment even when the treatment is *228 necessary to save the individual’s life; nor was this required at common law (Matter of Storar, supra, at 377). Thus we have held: "To the extent that existing statutory and decisional law manifests the State’s interest on this subject, they consistently support the right of the competent adult to make his own decisions by imposing civil liability on those who perform medical treatment without consent, although the treatment may be beneficial or even necessary to preserve the patient’s life” (Matter of Storar, 52 NY2d 363, 377, supra).
The hospital notes that most of our cases recognizing this right involved older persons who were suffering from terminal illnesses or conditions in which there was little or no hope of recovery (Matter of Storar, supra [terminal cancer]; Matter of Eichner v Dillon, supra [persistent vegetative state]; Matter of Westchester County Med. Center [O’Connor], 72 NY2d 517, supra [several strokes and loss of gag reflex]). It argues that the right to decline lifesaving medical treatment should be limited to such conditions; when, in the opinion of the patient’s doctors, a particular medical treatment will completely restore the patient’s health, the State’s interest in preserving life is stronger and should prevail over the patient’s wishes.
Actually the cited cases dealt with an extension of the rule, requiring the doctors and hospitals to respect the right even when the patient becomes incompetent if, while competent, the patient had clearly stated a desire to decline life-sustaining treatment under specified circumstances. In each case we held that this was a matter of personal choice, and that the patient’s wishes should be honored if there was clear and convincing evidence that the patient had made a firm resolve to decline life-sustaining treatment. Where there was such proof, we ordered that life-sustaining measures be discontinued (Matter of Eichner v Dillon, supra); but where the patient’s statements were equivocal and did not clearly show a firm resolve to make such a choice under the circumstances (Matter of Westchester County Med. Center [O’Connor] supra) or where the patient was incapable ever of making such a choice because of retardation (Matter of Storar, supra) we ordered that medical care continue.
In those cases the patients’ physical condition was considered relevant only because the patients were incompetent when the court applications were made and we were therefore required to determine whether those were the circumstances in which the patients intended to decline the medical care. *229 The requirement was imposed by the patients, not by the State. Consideration of the patient’s physical condition in those cases was necessary to give effect to the patient’s wishes. The right of a patient to decline life-sustaining treatment was recognized in these cases, not because the State considered their lives worthless, but because the State valued the right of the individual to decide what type of treatment he or she should receive under particular circumstances.
The hospital’s principal argument is that the State has an interest in preserving the life of the patient for the benefit of her child. In other words, a competent adult could never refuse lifesaving treatment if he or she were a parent of a minor child. Concededly, this was the opinion of the concurring Justice at the Appellate Division, and there is authority for this proposition in some of the lower court decisions of this State and in decisions from other jurisdictions (see, e.g., Application of President & Directors of Georgetown Coll., 331 F2d 1000, reh denied 331 F2d 1010, cert denied sub nom. Jones v President & Directors of Georgetown Coll., 377 US 978; Matter of Delio v Westchester County Med. Center, 129 AD2d 1; Matter of Melideo, 88 Misc 2d 974; Matter of Winthrop Univ. Hosp. v Hess, 128 Misc 2d 804; cf., Randolph v City of New York, 117 AD2d 44, 49, mod on other grounds 69 NY2d 844; see also, Annotation, Patient’s Right to Refuse Treatment Allegedly Necessary to Sustain Life, 93 ALR3d 67, 82-83). However, there appears to be disagreement among the courts that recognize the exception as to whether the perceived State’s interest is to preserve the family unit intact (the two-parent rule proposed by the hospital in this case) or to simply insure that the child is not left parentless (the one-parent rule adopted by the Appellate Division in this case). Some decisions suggest the court apparently would apply the restriction whenever the patient has a dependent. Other courts perceiving the State’s interest to be in favor of honoring the patient’s wishes, have completely rejected the proposed restriction (see generally, Annotation, op. cit., 93 ALR3d 67, 82-83).
In our prior cases we have alluded to the problem (Matter of Storar, supra, at 377-388, n 6), but this is the first case in which a patient refusing lifesaving treatment has a minor child, and thus the first case in which we are called upon to decide the issue.
There is no question that the State has an interest in protecting the welfare of children. However, at common law *230 the patient’s right to decide the course of his or her own medical treatment was not conditioned on the patient being without minor children or dependents (Schloendorff v Society of N Y. Hosp., supra). Similarly, when the Legislature codified the common-law rule it imposed no such restriction (Public Health Law §§ 2504, 2805-d). And the hospital can point to no law or regulation which requires a parent to submit to medical treatment to preserve the parent’s life for the benefit of a minor child or other dependent. If, as the hospital urges, the State has an interest in intervening under these circumstances, it has never expressed it.
In the absence of any statute or decision from this court limiting the rights of patients who happen to be parents, the hospital turns to the law of domestic relations, and seeks to equate a parent who declines essential medical care with a parent who intentionally abandons a child. It is argued that since the State, as parens patriae, will not allow a parent to abandon a child, it will not permit "this most ultimate of voluntary abandonments’’ (Application of President & Directors of Georgetown Coll., 331 F2d 1000, 1008, supra). This argument extends the concept of abandonment far beyond the boundaries recognized in this State, and into areas where it would conflict with other substantial interests.
Although the State will not permit a parent to abandon a child, the State has never gone so far as to intervene in every personal decision a parent makes which may jeopardize the family unit or the parental relationship. The laws of adoption and divorce show that the State recognizes competing interests and, in some instances, accords them priority. Indeed the State’s need to punish those who violate its laws has never been held to be subordinate to the needs of the prisoner’s family (see, e.g., Ferrin v New York State Dept. of Correctional Servs., 71 NY2d 42). Thus the State’s concern with maintaining family unity and parental ties is not an interest which it enforces at the expense of all personal rights or conflicting interests.
The State’s interest in promoting the freedom of its citizens generally applies to parents. The State does not prohibit parents from engaging in dangerous activities because there is a risk that their children will be left orphans. There are instances, as the hospital notes, where the State has prohibited the public from engaging in an especially hazardous activity or required that special safety precautions be taken *231 by participants. But we know of no law in this State prohibiting individuals from participating in inherently dangerous activities or requiring them to take special safety precautions simply because they have minor children. There is no indication that the State would take a more intrusive role when the risk the parent has assumed involves a very personal choice regarding medical care. On the contrary, the policy of New York, as reflected in the existing law, is to permit all competent adults to make their own personal health care decisions without interference from the State.[3]
In sum, the patient, as a competent adult, had a right to determine the course of her own treatment, which included the right to decline blood transfusions, and there is no showing that the State had a superior interest, in preventing her from exercising that right under the circumstances of this case. The citizens of this State have long had the right to make their own medical care choices without regard to their physical condition or status as parents.
Accordingly, the order of the Appellate Division should be affirmed.

. The case is technically moot because the patient received the transfusions before the Appellate Division vacated the order. Despite the mootness we granted leave to appeal and we may retain the appeal when the case involves significant and novel issues of State-wide importance which are likely to recur but which typically escape review because of the time it takes to appeal such decisions (Matter of Storar, 52 NY2d 363, 369-370). This case now before us meets these criteria and we will therefore retain the appeal and decide the merits to provide guidance in future cases.

. Contrary to the assertion in Judge Simons’s concurrence we in no way condone suicide and intend no inference in that regard. What the concurrence overlooks is that the injury here was not self-inflicted nor does the patient want to die.

. Contrary to the suggestion in the concurring opinions, we are not saying that a statute or regulation is necessary to establish or strengthen an identifiable State’s interest. A particular State interest in individual, otherwise private, conduct arises by virtue of the shared common goals and needs of the body politic and exists whether or not the Legislature has chosen to take specific action implementing that interest. All we are saying is that on this record none of the interests asserted by the hospital can be said to outweigh the patient’s right to make her own medical choices, a right which is recognized at common law and supported by existing statutes and constitutional principles.