[650 NYS2d 373]

In the Matter of SCOTT MATTHEWS. UNITED CEREBRAL PALSY ASSOCIATION OF THE CAPITAL DISTRICT INC., Respondent; KATHLEEN MATTHEWS et al., Appellants, and MENTAL HYGIENE LEGAL SERVICES, Respondent.

Third Department, November 26, 1996

## APPEARANCES OF COUNSEL

*Christina L. Tangredi* and *Dale L. Moore,* Albany, for appellants.

*D'Agostino, Hoblock, Greisler & Siegel, P. C.,* Albany *(Daniel J. Tyson* of counsel), for United Cerebral Palsy Association of the Capital District Inc., respondent.

*Bruce S. Dix,* Albany *(Sheila E. Shea* of counsel), for Mental Hygiene Legal Services, respondent.

*Bloomberg & Magguilli,* Albany *(Michael C. Magguilli* of counsel), guardian ad litem for Scott Matthews.

*Cliff Zucker,* Albany, for Disability Advocates Inc. and others, *amici curiae.*

## OPINION OF THE COURT

CARDONA, P. J.

Respondents Kathleen Matthews and Gary Matthews (hereinafter collectively referred to as respondents) are the parents and court-appointed guardians of Scott Matthews, a 28-year-old mentally retarded individual with spastic quadriplegia secondary to cerebral palsy, as well as various other medical ailments including recurrent respiratory tract infections, seizures, severe scoliosis and sacral decubiti (i.e., bedsores). Petitioner is the operator of the intermediate care facility where Scott resides, which facility is certified under the Mental Hygiene Law by the Office of Mental Retardation and Developmental Disabilities. Respondent Mental Hygiene Legal Services (hereinafter MHLS) represents residents in petitioner's facilities.

Presently, Scott is fed orally but has been described as severely malnourished. Due to various difficulties, including illness, fatigue and a swallowing disorder, Scott's ability to eat orally had been decreasing and, in May 1996, he was directed to be fed three supplemental feedings a day. Although Scott's ideal body weight has been described as "50-plus pounds", he

has never weighed more than 55 pounds.[1] In June 1995 Scott weighed 54.5 pounds, in July 1995 he weighed 51.5 pounds and in August 1995 he weighed 53.1 pounds. In February 1996 Scott weighed 47 pounds, in March 1996 he weighed 46.1 pounds and in May 1996 he weighed 43 pounds. Scott's weight then dropped to 42.4 pounds but, by early August 1996, Scott's weight increased to 44 pounds. Scott's father testified on August 16, 1996 that Scott's current weight was 45.6 pounds.

During the period of weight loss, Scott was admitted to the hospital on four separate occasions: in September 1995, February 1996, April 1996 and July 1996. Scott's admitting physician for the first two hospitalizations was Carl Shapiro, a board-certified physician in internal medicine employed by petitioner who was Scott's attending physician from September 1995 through April 1996. Documentary evidence indicates that during the first two hospitalizations, Scott was aggressively treated for dehydration and malnutrition and was, *inter alia*, administered nutrition by intravenous feeding.

Because of Scott's swallowing disorder and concerns over his aspiration of food in addition to his ongoing problem of aspirating his bodily secretions, the subject of whether Scott should be given a gastrostomy tube[2] or other medically appropriate feeding or hydration tube has been periodically discussed as early as 1985 or 1986. Respondents have consistently declined this course of medical treatment, citing, *inter alia*, concerns over the possible resultant complications[3] and the effect on Scott's emotional well-being if he was denied the social contact

---

1. The record indicates that because of, *inter alia*, Scott's disabilities, low mobility and energy consumption, lung problems and scoliosis, it would not be advantageous for Scott to weigh much more than his ideal weight.

2. A gastrostomy tube is surgically placed into the stomach through an incision in the abdomen, thereby allowing food to be passed through the tube directly into the stomach cavity. The tube is replaced approximately every six months.

3. There is no dispute that placement of a feeding tube in Scott poses certain risks and possible complications. It was also generally agreed that these risks were, to a great extent, foreseeable and could probably be medically managed. Some of the risks discussed were problems with the anesthesia due to Scott's scarred lungs, the strong possibility of "reflux" if Scott vomited which could push food and stomach acid into the pharynx where it could be aspirated, local skin irritation, allergic reaction and/or infection from placement of the tube, ulceration and bleeding in the stomach and stomach lining, tube blockage over time, osmotic diarrhea, and also the risk of the feeding tube "migrating". It was agreed that because of his handicaps and physical condition, Scott was more at risk from reflux and infection than other patients.

that feeding with others provided.[4] While the record indicates that Shapiro supported respondents' decision in the past because of concerns over complications to Scott if a feeding tube was placed and "the burden of instrumentation", he revised his recommendation in February 1996 and recommended placement of a feeding tube based upon his opinion that Scott's malnutrition was life threatening and ·Scott "does not and can not" get adequate nutrition and hydration from ·oral feeding. Shapiro opined that if Scott could increase his nutritional reserves it would, *inter alia*, aid his body in fighting infection and healing bedsores.

Thereafter, Patrick Caulfield, a board-certified general practitioner specializing in family practice and geriatrics, began treating Scott while Shapiro was on vacation. Caulfield has been Scott's attending physician since April 1996 when Scott was hospitalized for aspiration pneumonia. Caulfield does not recommend a feeding tube and has pursued an aggressive course of oral feeding including supplemental feedings and protein powders added to Scott's food. In May 1996, respondents consented to the performance of a pharyngoesophagram[5] on Scott which established that Scott aspirates food to a varying degree when he eats. In July 1996, after respondents refused to consent to petitioner's request for the placement of a feeding tube in Scott, petitioner sought a court order to have such procedure performed. Following the commencement of the proceeding, Scott was again hospitalized, this time as a result of his contraction of morganella, a disease caused by an environmental bacteria described as "a fecal, oral type pathogen".

A hearing before Surrogate's Court was conducted in July 1996 and August 1996. The record evidence is clear that Scott's handicaps or problems with aspiration would not be alleviated by placement of a feeding tube and that its use was primarily

**4.** There was conflicting testimony over whether it would be practicable for Scott to "eat for pleasure" should a feeding tube be placed in light of testimony from petitioner's witnesses as to the health hazards experienced by Scott due to his aspiration of food. There was testimony indicating that it might be wiser to deny him the opportunity of eating with the others under petitioner's care but could be fed by his parents if they chose. There is testimony in the record from one of petitioner's physicians that patients who are on feeding tubes in facilities and cannot take food orally are usually isolated at mealtimes so as not to promote a sense of envy in the patient not being fed.

**5.** Otherwise known as a video fluoroscopy, a pharyngoesophagram is an X-ray study of the swallowing process.

recommended to prevent Scott from succumbing to malnutrition. Four physicians testified at the hearing: Shapiro, Peter Koltai, a board-certified physician in otolaryngology (ear, nose and throat) and head and neck surgery, who heads a swallowing disorders clinic for petitioner and who first saw Scott in April 1985, Caulfield, and Richard Clift, a court-appointed physician who is board-certified in internal medicine and gastroenterology. In addition, Deborah O'Connell, a licensed speech language pathologist employed by petitioner, testified regarding Scott's feeding patterns and how his intake had declined up to the time of his July 1996 hospitalization. Scott's father testified regarding his experiences in feeding his son and the success that he has had in doing so. Caulfield and Clift both testified that, at the time of the hearing, Scott was receiving sufficient nutrition through oral feedings and, furthermore, the evidence indicated that his bedsore had almost healed.

Thereafter, over the opposition of respondents and the guardian ad litem, Surrogate's Court granted the petition. The court found, *inter alia*, that the evidence demonstrated that Scott "suffers from profound life-threatening malnutrition" and indicated that it was constrained to authorize the placement of a feeding tube, contrary to respondents' wishes, since, due to his mental capacity, Scott has never been able to form and express an opinion, by clear and convincing evidence, on the matter. Respondents appealed this order and obtained a stay pending determination of their appeal.[6]

Initially, it must be emphasized and made clear that this is not a "right to die" case. Although the matter is presented to this Court in a maelstrom of emotionalism from all sides as to the proper approach to be taken in this very difficult matter, no one is advocating that Scott be permitted to starve to death. In fact, at the hearing before Surrogate's Court, Scott's mother spoke in terms of Scott's right to live with dignity and his right to make his own choice to eat in order to sustain himself.[7] The record supports the finding of Surrogate's Court that respondents "have consistently demonstrated during Scott's lifetime their overwhelming dedication to Scott's best interests, extending every effort to minimize his pain and maximize his

---

6. United Cerebral Palsy Associations of New York State Inc., the Association for Persons with Severe Handicaps and Disability Advocates Inc. obtained permission to file a joint *amicus* brief.

7. Scott's mother pointed out that Scott, who is quadriplegic, nonverbal and incontinent, makes no other purely voluntary decision than his choice to eat.

quality of life and dignity". Rather than following an approach of letting Scott starve to death (*see, e.g., Matter of Westchester County Med. Ctr. [O'Connor], 72 NY2d 517*), the record indicates that respondents, with the assistance of Scott's treating physician, have and are vigorously pursuing all avenues to encourage Scott to receive enough nutrition orally in order to sustain himself.

According to respondents, the hearing evidence established that the placement of a feeding tube is not in Scott's best interest. The position taken by petitioner and MHLS is that Scott can no longer sustain his nutritional and hydration needs through oral feeding and that a gastrostomy tube is necessary to sustain his life. Scott's guardian ad litem argues that respondents' decision to withhold their consent to the placement of the gastrostomy tube was "an acceptable course of medical treatment" and that petitioner and MHLS have no right to interfere with the course of treatment being pursued by respondents and Scott's treating physician. Clearly, all sides are genuinely concerned about Scott. They differ, however, as to what is best for him.

The above being said, the question turns as to what are the appropriate guidelines to be used in determining this matter. Courts are naturally reluctant to interfere in such cases unless such intervention is warranted (*see generally, Matter of Storar, 52 NY2d 363, cert denied sub nom. Storar v Storar, 454 US 858*). Here, it is undisputed that although Scott is 28 years old, he is profoundly retarded, nonverbal and has never been competent at any point in his life to make a reasoned decision about his own medical treatment. In fact, there was expert testimony that Scott is incapable of following even the simplest of directions that would ease his swallowing difficulties. Thus, Scott is no more capable of determining whether a feeding tube is warranted in his case than an infant would be in similar circumstances. Consequently, Scott in this respect is no different than John Storar, the 52-year-old retarded man with terminal bladder cancer discussed in *Matter of Storar (supra)*.

Storar was losing blood as a complication of his condition and his mother and legal guardian refused to consent to blood transfusions to prolong his life despite the uniform recommendation of the physicians in charge of Storar's treatment at the State facility where he resided. The Court of Appeals noted in *Matter of Storar (supra)* that in situations where an individual has always been incompetent to make his or her own decisions, resolution of consent to treatment issues would be guided by

different principles than those in a situation where a formerly competent patient subsequently becomes incapable of rendering his or her own treatment decisions (see, supra, at 380).[8] Thus, in the case at hand, the reference by Surrogate's Court to standards applicable to formerly competent patients is inapposite and the law relating to decisions as to life-sustaining treatment for infants is the only fair method by which Scott's rights can be assessed.

In Matter of Storar (supra), the Court of Appeals noted that parents have the right to consent to medical treatment on behalf of the infants or incompetent adults in their care and that "it is not for the courts to determine the most 'effective' treatment when the parents have chosen among reasonable alternatives" (supra, at 381, citing Matter of Hofbauer, 47 NY2d 648). However, in ruling in favor of the State facility's application, the Court was clear in emphasizing that a parent "may not deprive a child of lifesaving treatment, however well intentioned" (Matter of Storar, supra, at 380). In examining Matter of Storar (supra) and Matter of Westchester County Med. Ctr. (72 NY2d 517, supra), it is apparent to this Court that respondents cannot and should not be permitted to make a decision that would result in Scott starving to death, if such could be medically avoided, regardless of how soon he may or may not succumb from other causes. It further follows that a medical recommendation to effectively deny sustenance to a starving patient would be unreasonable on its face. Thus, the pivotal question in this case is whether petitioner is correct in arguing that respondents are depriving Scott of lifesaving or life-prolonging treatment or whether respondents are within their rights in choosing aggressive oral feedings as a reasonable medical approach to Scott's nutritional difficulties given the risks (see, Weber v Stony Brook Hosp., 95 AD2d 587, 589, affd on other grounds 60 NY2d 208, cert denied 464 US 1026).

This question raises what we consider to be an important distinction between the instant case and Matter of Storar (supra), namely, the difference in medical opinion presented, especially the opinion of Scott's treating physician. Unlike the

---

8. In Matter of Eichner v Dillon (52 NY2d 363), the companion case decided with Matter of Storar (supra), the Court of Appeals determined that a decision to decline necessary medical treatment could only be honored if it could be determined by clear and convincing proof that this is what the formerly competent and presently incompetent person would have wanted. The court never mentioned a clear and convincing standard in its discussion of John Storar's situation.

case of John Storar, Scott does have a personal attending physician. In commenting on the absence of such a person in *Matter of Storar* (*supra*), the Court of Appeals noted that "as a matter of public policy a medical facility generally has no responsibility or right to supervise or interfere with the course of treatments recommended by the patient's private physician, even when the patient is incapable of consent due to age [or capacity]" (*supra*, at 373, n 3). Thus, it could persuasively be argued that because the position taken by respondents is supported by the opinion of Scott's treating physician, a licensed practitioner, the petition should be dismissed since this is "a matter to be decided by the private physician with the patient's family and [petitioner] would have no power to intervene or standing to sue" (*supra*, at 374, n 3; *cf.*, *Matter of Weber v Stony Brook Hosp.*, 60 NY2d 208, *cert denied* 464 US 1026, *supra*).

Nevertheless, assuming that the presence in the record of medical support for respondents' position is not enough in and of itself to end our inquiry, we therefore proceed to determine whether respondents' reliance upon Caulfield's advice is reasonable under the circumstances. Significantly, in noting the right of parents to choose among reasonable alternatives in determining medical care for their children, the Court of Appeals in *Matter of Storar* (*supra*) cited to its earlier decision in *Matter of Hofbauer* (47 NY2d 648, *supra*), a case which provides guidance herein despite the different focus of that proceeding.

In *Matter of Hofbauer* (*supra*), a neglect petition was filed involving a seven-year-old child who was suffering from Hodgkin's disease; the child's parents had failed to follow an attending physician's recommendation to have the child's disease treated by radiation and chemotherapy, choosing instead to transfer his care to a duly licensed physician advocating nutritional or metabolic therapy, including controversial injections of laetrile. In agreeing that the neglect petition was properly dismissed and that the parents' concern over the side effects of other treatments was valid, the Court of Appeals noted that the key in determining whether an infant is being deprived of adequate medical care "is whether the parents have provided an acceptable course of medical treatment for their child in light of all the surrounding circumstances" (*supra*, at 656). In other words, "the court's inquiry should be whether the parents, once having sought accredited medical assistance and having been made aware of the seriousness of their child's affliction * * * have provided for their child a treatment which is recommended by their physician and which

has not been totally rejected by all responsible medical authority" (*supra*, at 656). It is significant that the Court of Appeals specifically noted that "great deference must be accorded a parent's choice as to the mode of medical treatment to be undertaken *and the physician selected to administer the same*" (*supra*, at 655 [emphasis supplied]).

In considering all of these principles together, it appears to us that in cases where there is a division of medical opinion as to the appropriate treatment for a life-threatening condition, deference should be given to the decision of the parents as long as the chosen course of treatment is a reasonable one within medical standards. Petitioner and MHLS maintain that Caulfield's opinion is suspect because he allegedly based it not on medical grounds but on what they deem to be improper personal ethical views relating to Scott's comfort and "quality of life"[9] (*see, Matter of Storar*, 52 NY2d 363, 375, *supra*; *see also, Matter of Westchester County Med. Ctr. [O'Connor]*, 72 NY2d 517, *supra*). At the hearing, however, Caulfield was specifically asked whether his medical opinion was influenced by any personal ethical concerns and he responded in the negative. Caulfield pointed out that he was not opposed to feeding tubes in principle and that he has, in fact, supported their use on many occasions for patients in his practice. Significantly, parents "may rely upon the recommendations and competency of the attending physician if he or she is duly licensed to practice medicine in this State, for '[i]f a physician is licensed by the State, he [or she] is recognized by the State as capable of exercising acceptable clinical judgment' " (*Matter of Hofbauer*, 47 NY2d 648, 655, *supra*, quoting *Doe v Bolton*, 410 US 179, 199).

Turning to the medical evidence, we conclude upon an examination of the record, and especially the testimony of Caulfield, that petitioner has not established that respondents have acted to deprive their son of reasonable medical care and life-prolonging treatment. Notably, there was no dispute at the hearing as to the existence of Scott's swallowing disorder and the difficulties this presents with his eating. The disagreements in the testimony primarily dealt with how risky a feeding tube

---

9. As support for this argument, this Court's attention was directed to a "To Whom it May Concern" letter dated July 15, 1996 authored by Caulfield, stating, *inter alia*, his personal belief that the State should not have the right to interfere in decisions by parents to decline the use of "artificial means to prolong the life of [a child with a chronic condition and a guarded prognosis]".

would be for Scott, how advanced his malnutrition is and the appropriate method for treating his difficulties in obtaining enough nutrition.

Shapiro, who last examined Scott in April 1996 during the period when his condition was declining, testified that Scott was deteriorating too rapidly and that a feeding tube was required to keep him from starving to death. Shapiro opined that malnutrition was Scott's preeminent problem at this point and that this was evidenced by, *inter alia*, his inability to heal his bedsore. Koltai agreed with Shapiro that malnutrition was Scott's worst problem and stated that he believed that a feeding tube would provide Scott with the extra nutrition needed to heal his bedsore and to fight infection.

Caulfield stated that he felt Scott's two major concerns were healing his bedsore and his aspiration. He expressed particular concern over the unavoidable danger of Scott aspirating bacteria probably from his oral secretions. While agreeing that Scott was malnourished, Caulfield noted that Scott was presently able to gain weight and that his bedsore was healing; therefore, he was not convinced that Scott's nutritional reserves were "inadequate to be supporting his basic healing needs and his basic muscle needs, nutritional needs, respiratory needs". Caulfield specifically testified that he believed that the additional protein powders being ingested by Scott were aiding in this process and that because Scott was having success with the present course of treatment, the wiser course would be to continue with what was working rather than try a procedure that could potentially be beneficial but could also cause complications and shorten Scott's life span.

Clift's direct testimony at the hearing supported this view in that he testified that, from his examination of Scott, he was ingesting approximately 1,400 calories a day and was receiving sufficient protein through oral feeding. Clift considered Scott's present condition to be stable and, while he believed that the use of a feeding tube would be beneficial, he opined that it was not essential to sustain Scott's life.[10] Significantly, Caulfield agreed that a feeding tube could aid Scott nutritionally, but he

10. Petitioner argues that, on cross-examination, Clift stated that if confronted with proof that Scott was steadily wasting away, he would agree that Scott could not sustain himself by oral feedings alone. However, no one asked Caulfield whether his opinion about use of a feeding tube for Scott would change if Scott's condition again began to deteriorate.

also testified that he had occasionally seen some severe complications with patients who had feeding tubes placed.[11]

Thus, the crux of Caulfield's testimony seemed to be that as long as Scott could hold his own nutritionally with oral feedings, it was premature to try a more invasive procedure in light of respondents' concerns. The evidence concerning Scott's weight gain and improved healing ability demonstrates objective medical support that he was improving under Caulfield's care (see, Matter of Hofbauer, 47 NY2d 648, 653, supra). This is not to say that we consider the testimony from petitioner's physicians to be unpersuasive; however, we do not believe that the evidence produced at the hearing presented the extreme situation which would necessitate this Court to countermand the treatment prescribed by a patient's attending physician. Had proof been presented clearly establishing that Scott's condition was deteriorating under Caulfield's care and that he was being deprived of life-sustaining treatment, we would have agreed with petitioner and granted its requested relief.

In light of the foregoing analysis, we find it unnecessary to address the parties' remaining contentions, including the competing arguments relating to applicable legal standards.

MERCURE, CASEY, SPAIN and CARPINELLO, JJ., concur.

Ordered that the order is reversed, on the law and the facts, without costs, and petition dismissed.

11. Caulfield opined that Scott would likely die from pneumonia during the next six months as a result of aspirating on a bacterium regardless of whether he had a gastrostomy tube. Caulfield stated that while aspirating food was not beneficial from the point of view that food is a foreign object, food does not generally contain bacteria and he felt that this was Scott's greatest source of danger. While Koltai did testify that oral feeding increased the likelihood of Scott aspirating and the aspiration of food would damage his lungs, the testimony from Shapiro and Koltai was clear in demonstrating that it was not Scott's long-standing problem with aspiration of food that was life threatening, it was the malnutrition. Notably, Caulfield's views on this subject are not inconsistent with the testimony of petitioner's physicians, who both cautiously agreed that Scott could still be given some food for the pleasure of eating were a feeding tube to be placed even though some of this food would likely be aspirated.