Matter of J.C. (2004 NY Slip Op 51739(U))

[*1]

Matter of J.C.

2004 NY Slip Op 51739(U)

Decided on December 23, 2004

Family Court, Orange County

Kiedaisch, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 23, 2004

Family Court, Orange County
In the Matter of J.C., A Child under Eighteen Years of Age Alleged to Be Neglected by L.F. J.F.
611-04

Debra J. Kiedaisch, J.
The respondent in this case, L.F., is the aunt of J. C., the subject child in this neglect proceeding, and was granted custody of J. C., who was born on April 22, 1987, by order of the Family Court, signed January 19, 1993. It is alleged J. C. suffers from various significant deficits including emotional problems, a serious stutter, and an IQ of 57. J. C. had been residing with respondents, L. F. and her husband, J. F., until the issuance of an order by this Court, signed March 23, 2004, which directed the temporary removal of J. C. from the F.s' household, and placed J. C. in the custody of the Commissioner of Social Services of Orange County (FCA 1021). J. C. has since been placed by petitioner in a therapeutic foster home setting.
THE CHARGES
The petition in this proceeding alleges that J. C. had exhibited "aberrant behavior" and that on February 10, 2004 the police became involved upon it being alleged J. C. had been acting in a threatening and abusive manner towards Ms. F. It is alleged Ms. F. wanted J. C. arrested but the investigating police officer, believing J. C. was suicidal, viewed the matter as a mental health issue and wanted J. C. to undergo psychiatric evaluation. As the basis of the neglect allegations in the petition it is alleged Ms. F. failed to properly recognize J. C.'s suicidal ideations and obtain proper medical treatment for him. It is alleged Ms. F. obstructed and wrongfully refused to assist the police officer and caseworkers or youth counselors who became involved in having J. C. admitted to Arden Hill Hospital for mental health evaluation, and subverted his admission into Four Winds Hospital.
Specifically, the petition alleges that (1) L. F. refused to cooperate with the police officer and his suggestions for mental health evaluation of J. C. insisting that she would not be inconvenienced by spending several hours waiting during the [mental health evaluation] intake process with her solution being to have J. C. arrested, (2) L. F. refused to cooperate with the recommendation by A Friend's House shelter that J. C. be hospitalized at Four Winds Hospital [*2]for a psychiatric evaluation and expressly informed the shelter staff she would not sign any papers to have J. C. admitted for mental health evaluation, (3) L. F. affirmatively sabotaged J. C.'s placement for mental health evaluation at Four Winds Hospital by telling hospital intake personnel that J. C. was low functioning, was incontinent, could not attend to his personal needs, and that she disagreed with J. C.'s placement and would not cooperate with Four Winds Hospital, and (4) upon J. C. being transported to Arden Hill Hospital for an emergency mental health assessment L.F. and J. F. declared the police were trying to discredit the F.s, and that J. C.'s talk of suicide was created by J. C. simply as a means to get attention.
THE TESTIMONY
This Court has conducted a hearing on the petition at which several witnesses testified. The Court has also had the opportunity to observe the demeanor of the witnesses and parties who appeared in the proceeding. Upon such evidence, the Court now renders its determination upon the petition.
The witness, Town of Warwick Police Department, Sergeant Thompson, testified that on February 10, 2004 he received a report that L. F. had telephoned stating that J. C. was acting out, being aggressive towards her, and was throwing things out of the house into the yard. Ms. F. alleged J. C. screamed obscenities at her and threw her coffee cup and coat into the front yard of the house, and ran out of the house. Sergeant Thompson testified that J. C. was eventually found later that evening by several police officers and brought to the Warwick police station. The F.s also came to the police station. Sergeant Thompson stated when J. C. appeared at the police station he was relatively calm. Sergeant Thompson testified J. C. told Sergeant Thompson he got angry and overreacted. Sergeant Thompson stated J. C. also told him that he, J. C., put a belt around his own neck and choked himself. Sergeant Thompson further stated that J. C. said he wanted to shoot one of his teachers but that he knew it was wrong, and would not really do it. Sergeant Thompson stated that Ms. F. did not want J. C. returned to the F.s' home and wanted to press criminal charges against J. C.. Sergeant Thompson stated he told the F.s he wanted to take J. C. to A Friend's House shelter but the shelter would not take him without J. C. first being psychiatrically examined. Sergeant Thompson stated Ms. F. opposed the suggestion to have J. C. mentally evaluated stating she did not want to become involved in waiting around the hospital, and wanted J. C. arrested. Sergeant Thompson stated that Ms. F. told him the last time she took J. C. to Arden Hill Hospital she had to remain there about 8 hours. Sergeant Thompson stated he arranged with A Friend's House that if J. C. was not an immediate threat to himself, or anyone else, they would accept J. C. into A Friend's House. Sergeant Thompson testified the F.s did subsequently agree to transport J. C. to Arden Hill Hospital without police assistance and cooperated in admitting J. C. for evaluation. Sergeant Thompson also stated the F.s transported J. C. to A Friends House when J. C. was discharged from Arden Hill Hospital after said evaluation.
Jasoda Dunkley, a mobile health Clinician Social Worker who holds an MSW from Fordham University, but is not a certified social worker, testified in this case. Ms. Dunkley stated that during the assessment of J. C. performed by her to determine whether or not to admit him into A Friend's House on the evening of February 10, 2004 J. C. stated he had attempted suicide by taking a belt and hanging himself. Ms. Dunkley stated that when she asked J. C. how he felt at that moment during the assessment that J. C. replied he was still feeling suicidal as they spoke [*3]and that if he went back to the F.s' home he would hurt himself. Ms. Dunkley stated that J. C. wanted to go into foster care rather than return to the F.s' home. Ms. Dunkley stated she accepted what J. C. said at face value and concluded J. C. was at high risk. Ms. Dunkley stated that when she told Ms. F. that J. C. stated he was suicidal Ms. F. replied she knows her nephew and that J. C. was not suicidal. Ms. Dunkley stated Ms. F. further told her that she [Ms. Dunkley] was not qualified to make such judgment. Ms. Dunkley testied that she had tried to get J. C. admitted into Four Winds Hospital but that the hospital declined based allegedly on statements Ms F. made to them concerning J. C.'s limitations. No one from Four Winds Hospital testified in this case as to why they declined to admit J. C.
Robin Donovan testified that she is a case manager for A Friend's House. She testified that in the early evening of February 10, 2004 she learned that J. C. had been referred to A Friend's House shelter. She testified she understood J. C. had been violent toward the F.s and ran out of their house naked, and tried to hang himself the night before. She testified she understood Sergeant Thompson had requested A Friend's House to take J. C. but the shelter could not do so because J. C. was suicidal and needed a mental health evaluation [to demonstrate he was not a danger to himself or others] before he could be accepted into A Friend's House. Robin Donovan stated she accepted as true that J. C. was suicidal based on J. C. telling her so. Robin Donovan stated that A Friend's House agreed to take J. C. in at about 2 or 3 A.M. [which would be the morning of February 11, 2004], and that the staff of A Friend's House engaged in an all night watch over J. C.. Robin Donovan stated A Friend's House later that day felt they had to send J. C. to Arden Hill Hospital for a second mental health evaluation because J. C. continued to state he was having suicidal feelings. Robin Donovan stated she had met J. C. on several previous occasions at A Friend's House and on this occasion J. C. seemed comparatively depressed and not as talkative or positive as he had on past occasions. Robin Donovan did testify that there were no incidents involving J. C. during the night while the staff kept watch over J. C., and that J. C. slept through the night. Robin Donovan testified in a conversation she had with Ms. F. that Ms. F. characterized J. C., in effect, as overly dramatic and attention seeking. Robin Donovan stated she did not agree with this assessment of J. C. and that J. C. did not appear to her to be overly dramatizing his situation. Robin Donovan testified that J. C.'s admission to Four Winds Hospital had been secured without Ms. F.'s assistance but that, subsequently, Four Winds Hospital changed its mind allegedly based on statements made by Ms F. to Four Winds Hospital personnel. Robin Donovan stated that after J. C. was taken [the second time] to Arden Hill Hospital for evaluation, which was by a staff member, J. C. was transported to McQuade Children's Services.
L. F. testified in this case. She testified that J. C. first came to live with them in the summer of 1992, and she gained custody of J. C. in December, 1992.[FN1] Ms. F. testified that on [*4]February 10, 2004 J. C. came into the house and let her know he was angry at her by using profanity and calling her "bitch". Ms. F. alleges J. C. began emptying things out of his room including carrying his television set out of his room, and setting it down at the top of the stairs. Ms. F. stated she grabbed her coat and left the house with J. C. chasing her and calling her "bitch". Ms. F. stated she got in her car and drove away leaving J. C. standing on the deck of the F.s' house. Ms F. stated she telephoned Mr. F. [at work] telling him to call the police. Ms. F. testified that at the Warwick police station she spoke to Sergeant Thompson. Ms F. stated she told Sergeant Thompson she wanted J. C. arrested and brought before a Judge. Ms. F. stated she told Sergeant Thompson of a past occurrence in December, 2004 in Goshen, New York when J. C. allegedly attacked Mr. F. and they had J. C. arrested. Ms. F. testified that she thought the same thing would occur in this case in that J. C. would appear before a Judge and be released in two hours as had occurred in connection with the Goshen incident. Ms. F. testified that they took J. C. to Arden Hill Hospital at about 11:30 P.M. [on February 10, 2004] and that J. C. was released by Arden Hill Hospital by 1:00 A.M. [February 11, 2004]. Ms. F. testified they then took J. C. to A Friend's House at 1:30 A.M. Ms. F. testified someone from A Friend's House telephoned her later and she told the person that she, Ms. F., did not want to transport J. C. in her car as J. C. was violent. Ms. F. testified that after speaking to the person from A Friend's House Ms. F. telephoned Four Winds Hospital to confirm they had accepted J. C. for admission. Ms. F. testified she asked Four Winds Hospital what the criteria was for admission. Ms. F. testified J. C. did not meet the criteria for admission into Four Winds Hospital. Ms. F. testified she called the District Attorney's office and the Commissioner of Mental Health's office looking for help to place J. C. other than back in her house. Ms. F. stated that after J. C. had been brought to Arden Hill Hospital [for the second evaluation] someone from the hospital telephoned her to tell her J. C. was there. She stated she then went to Arden Hill Hospital and signed a consent which was used to admit J. C. into McQuade Children's Services. In her testimony Ms. F. stated J. C. has been seen by psychiatrists in the past and that J. C. had been an inpatient in Port Jervis Mercy Hospital in October, 2003 for 1 ½ weeks after, Ms F. stated, J. C. allegedly attacked her and her husband with a knife. Ms. F. testified she continues to disagree with the witnesses who said J. C. was suicidal. Ms. F. expressed the opinion that she was the person who knew what was best for J. C.. She characterized the actions taken by the various persons associated with the police, government, and shelters as "fascism" conveying the impression that she felt personally persecuted. There was also some testimony with respect to J. C.'s attendance at school. Ms. F. denied, when asked, that she refused to allow J. C. to go to Warwick Valley School. She testified J. C. was a student until November, 2003, and that between November, 2003 to January, 2004 J. C. refused to attend school in Warwick. Ms. F. alleged she contacted an attorney to have J. C. return to school and had petitioned for services to be provided to J. C..[FN2]
 Mr. F. testified in this case. He stated on February 10, 2004 he received a call from his wife, as he was at work in New York City, that J. C. was acting erratically including that J. C. threatened to throw his television set down the stairs in their home. Mr. F. stated he returned by bus to Warwick where he was met at the bus depot by Ms. F. and they drove to the Warwick [*5]police station. Mr. F. testified that after three or four hours at the station they went to Arden Hill Hospital at about 11:00 P.M. Mr. F. testified that they returned [again] to Arden Hill Hospital on February 11, 2004 and he was present during the [second] evaluation of J. C. performed at the hospital. After this second evaluation Arden Hill Hospital did not admit J. C. Mr. F. testified he saw his wife sign a consent form to permit J. C. to be admitted to McQuade Children's Services.
As to the issue of J. C.'s statements concerning suicide Mr. F. testified that the day before the events which precipitated this proceeding [February 9, 2004] at about 8:30 P.M. J. C. went to his room and threw his things out of the room, including his clothing and games such as his play station. Mr. F. testified that J. C. put a belt around his neck for about two seconds and then took it off. Mr. F. stated J. C. also put the belt around his waste and pulled it tighter. Mr. F. states he does not believe J. C. was genuinely attempting suicide or is suicidal. Mr. F. testified that, generally, J. C.'s behavior has been at its best since attending school in the Warwick school district and the F.s wanted to keep J. C. there but that in September, 2003 J. C. developed problems with a particular teacher and refused to go to school unless given another teacher. Mr. F. states he has not forced J. C. to return to school and has been in contact with school officials over this issue. Mr F. testified, in effect, that during this period of being out of school J. C. has had episodes of acting out. Mr. F. stated that in October, 2003 J. C. threw a bucket of paint across the room and allegedly pulled a knife on him. Mr. F. states following this incident he was advised to take J. C. to Port Jervis Hospital and the following day took J. C. to Stony Point Hospital for evaluation. Mr. F. states J. C. was prescribed liquid medicine to take but refused to take the medication. Mr. F. testified that after being discharged from Stony Point Hospital problems persisted with J. C. including the incident in Goshen in December, 2003 which Ms. F. referred to in her testimony. Mr. F. described the incident alleging J. C. assaulted him in the car outside of the Department of Social Services building in Goshen, New York, where the F.s had gone to complete certain paperwork concerning J. C.'s sister, I. C. Mr. F. alleges J. C. refused to get out of the car and grabbed Mr. F. by his coat and tried to punch him. Mr. F. states J. C. was arrested and the matter was eventually disposed of [in court] by an adjournment in contemplation of dismissal. Mr. F. further alleges that in January, 2004 J. C. grabbed him from behind while Mr. F. was driving the car.
Mr. F. testified J. C. was 5 years old when he came to live with them. Mr. F. states J. C. has attended school in the Warwick school district as well as BOCES. Mr. F. states J. C. was classified by the Committee on Special Education for the school district as handicapped. Mr. F. testified J. C.'s handicaps are multi-development. There is testimony in this case that J. C. has a significant stutter and a low IQ. Mr. F. testified J. C. has been seen by psychiatrists and counselors over the years as well as evaluated or treated in psychiatric hospitals including one in Westchester County. Mr. F. testified J. C. used to go to Westchester Medical Center for diagnosis and treatment. Mr. F. testified that at one point J. C. was being treated by a psychiatrist and given Ritalin but that the Ritalin prevented J. C. from sleeping and increased J. C.'s stuttering. J. C. has also been prescribed other medications but Mr. F. states all have seemed to worsen J. C.'s condition. Mr. F. attributed J. C.'s increasing aggressiveness to J. C. being out of school. Mr. F. testified he requested a specific Committee on Special Education meeting to consider possible placement for J. C. but that the school offered to place J. C. in Summit Hill in Rockland County. Mr. F. stated, in effect, he does not want J. C. to be placed outside of the Warwick school district [*6]as J. C. has appeared to have had his most positive behavior in the Warwick school district.
THE LAW
Essentially, the allegations of neglect set forth in the petition are that Ms. F. (and Mr. F., by implication) failed to cooperate in having a mental health evaluation provided for J. C. when J. C. made statements indicating suicidal ideation and failed to assist, if not affirmatively subverted, J. C.'s placement with the Four Winds Hospital. As relevant to the specific allegations of the petition, a neglected child means a child less than 18 years of age whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his lawful custodian, or other person legally responsible for his care, to exercise a minimum degree of care in supplying the child with adequate medical care although able to do so (FCA 1012[f][[i][A]; FCA 1012[g]). The definition of "impairment" includes a substantially diminished psychological ability of the child to thrive and control aggressive or self-destructive impulses which are clearly attributable to the unwillingness or inability of the responsible adult[s] to exercise a minimum degree of care towards the child (FCA 1012[h]). A responsible adult's failure to provide medical care as required by the statute may be interpreted to include psychiatric medical care where it is necessary to prevent the impairment of the child's emotional condition (In Re Felicia D. 263 AD2d 399; Matter of Jonathan C., 195 AD2d 554). Where a child's emotional health is impaired, and the impairment is clearly attributable to the responsible adult's unwillingness to pursue a recommended course of psychiatric therapy with the child, a court may find that the child is neglected within the meaning of Family Court Act 1012[f][i][A] (In Re Felicia D., supra).The burden of proof is upon the petitioner to prove in the fact finding portion of the case the truthfulness of the charges by a preponderance of the evidence with only competent, material and relevant evidence being admissible for such purpose (FCA 1046[b][I][ii]).
FINDINGS AND CONCLUSION
The allegations that Ms. F. sabotaged J. C.'s admission into Four Winds Hospital by statements she allegedly made to Four Winds Hospital personnel, as well as allegations that J. C. ran naked from the F.'s home, are all based on pure hearsay. No witness from Four Winds Hospital was called to testify as to any conversation with Ms. F., the reasons why Four Winds Hospital declined to admit J. C., or that Ms. F. was in any way responsible (wrongfully or otherwise) for Four Winds Hospital decision not to admit J. C.. There is no proof that J. C. ran naked from the F.s' home. When J. C. was brought to the police station he was clothed. With respect to obtaining a mental health evaluation for J. C. at Arden Hill Hospital the proof is that Ms. F. and Mr. F., although initially resistant to the idea, eventually joined on the evening of February 10, 2004 in transporting J. C. to Arden Hill Hospital, and cooperated with the hospital in order for J. C. to receive a mental health assessment. On February 11, 2004 Ms. F. executed the necessary forms for J. C. to be admitted to McQuade Children's Center. While it was the perception of the youth counselors who addressed J. C.'s needs the evening in question, and the petitioner in this proceeding, that Ms. F. was insensitive to J. C.s' statements pertaining to suicide, the fact that Ms. F. or Mr. F. did not agree that a mental health evaluation was warranted does not necessarily require a finding of neglect be made against them. The counselors who treated J. C. on February 10 and 11 took J. C.'s references to suicide at "face value." The F.s' testimony shows they did not, nor did they believe J. C. was truly suicidal. Rather, the F.s [*7]believed J. C. was acting out his agitation and unhappiness which they attribute to J. C.'s absence from school resulting from J. C.'s conflict with a teacher. J. C. was examined twice by Arden Hill Hospital doctors within a 48 hour period on February 10 and 11, 2004. After each examination Arden Hill Hospital failed to admit J. C.. Petitioner, who has the burden of proof, failed to adduce any testimony from Arden Hill Hospital on the issue of whether J. C. was suicidal. The Court concludes that if Arden Hill Hospital found J. C. to be suicidal it would not have discharged him. The inference to be drawn from Arden Hill Hospital's failure to admit J. C. is that the doctors who examined J. C. did not find J. C. was suicidal or a threat to others. Therefore, it appears the views of the doctors at Arden Hill Hospital on the issue of J. C.'s alleged suicidal ideation at the time in question coincide more closely with the F.s' view than petitioner's. While talk of suicide must always be regarded seriously, and the actions of the youth counselors involved were wholly proper and appropriate in seeking a mental health evaluation, the conduct of the F.s must be assessed under all of the relevant circumstances affecting their behavior, and not in a vacuum free from external influences (Matter of Hofbauer, 47 NY2d 648). The testimony of the F.s is that over the years they have obtained treatment for J. C. addressing his disabilities. The testimony of the F.s indicates they did not believe J. C. was, in fact, suicidal and believed a combination of services and disciplinary action was necessary to stem the trend in J. C.'s recent behavior where J. C. was becoming more physically aggressive towards them. It appears the F.s believed that having J. C. brought before an authority figure in the form of a Judge would help alter J. C.'s behavior. It remains the F.s did, in fact, cooperate in admitting J. C. to Arden Hill Hospital on February 10, 2004 for evaluation. Regardless of how the youth counselors and petitioner disapprove of the F.s' attitude the petitioner has not proved that the conduct of the F.s which is alleged in the petition impaired or imminently endangered J. C.'s mental or emotional condition (FCA 1012[f][[i][A]; FCA 1012[g]); (FCA 1012[h]; In the Matter of Shelley Renea "K," 79 AD2d 1073).
Questions have been raised at the hearing why J. C. has not, in fact, been attending school and what treatment or services the F.s are currently willing to obtain for J. C. or offer their cooperation in implementing.[FN3] The petitioner and Law Guardian in their closing arguments raised these issues as constituting neglect. However, neither of such issues, not attending school and the alleged failure to obtain services for J. C. [other than the Arden Hill Hospital suicide evaluation] were pleaded in the petition. The respondents were not placed on notice of such charges. In any event, the level of proof received at this hearing on such issues is inconclusive. Under the circumstances, the Court's ruling shall be limited to addressing the charges of neglect set forth in the petition.
For the reasons stated, herein, this Court finds the allegations of neglect against the respondents, L. F. and J. F., as set forth in the petition have not been proved.
Accordingly, it is hereby
ORDERED that the charges of child neglect set forth against respondents in the petition are dismissed.
While this Court has found the charges of neglect against the F.s as alleged in the petition have not been proved, the evidence adduced at the hearing demonstrates J. C. stands at a very [*8]critical juncture which this Court as parens patriae of the children coming before it simply cannot ignore. J. C. is not attending school, apparently, as noted, for problems he encountered with a teacher. Clearly, J. C. needs a structured setting with appropriate services made available to him. The F.s testified they were having continuing difficulties in preventing J. C. from acting out in a threatening manner towards them such that on the evening of February 10, 2004 Ms. F. felt compelled to flee from her home, alert the police, and summon Mr. F. from New York City. Everyone concerned with this proceeding has expressed that J. C. is in vital need of appropriate services. The F.s represent they have tried but have been unsuccessful in the recent past in obtaining services for J. C., and it appears they are at a loss how to proceed. Furthermore, J. C. will reach the age of majority in less than four months from today on April 22, 2005. It is noted that FCA 162 permits the Court to order psychological evaluations of persons within its jurisdiction, FCA 232 vests the Court with jurisdiction over children with physical disabilities (evidence indicates J. C. has neurological deficits among his other deficits), and FCA 233 directs that whenever a child within the jurisdiction of the Court appears to the Court to be in need of therapeutic care or treatment, a suitable order may be made. There is pending before this Court an application returnable January 12, 2005 at 10:00 A.M. to extend the current placement of J. C. with a permanency goal of discharging J. C. to an adult residential care facility.
Accordingly, it is
ORDERED the order of this Court, dated March 13, 2004, under which J. C. is receiving evaluation and services is continued pending further order of the Court.
Settle order on notice within 30 days.
 Dated: Goshen, NY E N T E R
 December 23, 2004

 _______________________________
 Hon. Debra J. Kiedaisch, J.F.C.

"Pursuant to section 1113 of the Family Court Act, an appeal must be taken within thirty days of receipt of the order by appellant in court, thirty-five days from the mailing of the order to the appellant by the clerk of the court, or thirty days after service by a party or law guardian upon the appellant, whichever is earliest."
TO:
L. F.
81 West Street
Warwick, New York 10990
J. F.
81 West Street
Warwick, New York 10990
[*9]
Peter Schwarz, Esq.
Orange County Department of Law
Family Court Unit
Orange County Courthouse
Goshen, New York 10924
Carla S. Wise, Esq.
Law Guardian
210 Main Street
Goshen, New York 10924
Footnotes

Footnote 1:The records of the Family Court of which this Court takes judicial notice shows J. C. has a sister, I. C., born September 27, 1984 (Casson v. Casson, 107 AD2d 342, 344; Weinberg v. Hillbrae Builders, Inc., 58 AD2d 546). Under the order, granted in court on December 16, 1992 and signed January 19, 1993, L. F., their maternal aunt, was granted custody of both children. I. C. was the subject of a neglect petition involving the F.s filed in this Court which was dismissed when I. C. reached 18 years of age.

Footnote 2:A search of this Courts' records disclose a PINS petition [FCA, Article 7] filed with respect to I. C., but not J. C.

Footnote 3: At this time, it is in J. C.'s interest for a controlled placid environment to prevail.