Matter of Brittany W. v Miles-Gustave (2026 NY Slip Op 00831)

Matter of Brittany W. v Miles-Gustave

2026 NY Slip Op 00831

Decided on February 17, 2026

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: February 17, 2026

Before: Kern, J.P., Scarpulla, Kapnick, Shulman, Hagler, JJ. 

Index No. 453039/23|Appeal No. 5630|Case No. 2024-04963|

[*1]In the Matter of Brittany W., Petitioner,
vSuzanne Miles-Gustave, etc., et al., Respondents.

Cleary Gottlieb Steen & Hamilton LLP, New York (Ethan Singer of counsel), for petitioner.
Muriel Goode-Trufant, Corporation Counsel, New York (Elizabeth I. Freedman of counsel), for City respondent.
Letitia James, Attorney General, New York (Joshua N. Cohen of counsel), for State respondent.

Determination of respondent New York State Office of Children and Family Services (OCFS), dated July 28, 2023, which, after a hearing, denied petitioner's request to amend, as unfounded, and to seal a September 8, 2017 indicated report finding maltreatment of her child, confirmed, the petition denied, and the proceeding brought pursuant to CPLR article 78 (transferred to this Court by order of Supreme Court, New York County [Shahabuddeen Abid Ally, J.], entered July 26, 2024) dismissed, without costs.
Substantial evidence supports OCFS's determination that petitioner maltreated her infant child (CPLR 7803 [4]). Notably, "[s]ubstantial evidence is a minimal standard . . . and requires only that a given inference is reasonable and plausible. Where substantial evidence exists, the reviewing court may not substitute its judgment for that of [OCFS], even if the court would have decided the matter differently" (Matter of Jeter v Poole, 43 NY3d 241, 253-254 [2024] [internal quotation marks and citation omitted]). A maltreated child includes one whose physical, mental, or emotional condition has been impaired or placed in imminent danger of impairment because of a parent's failure to exercise a minimum degree of care (Social Services Law § 412 [2]; Family Ct Act § 1012 [f] [i]). The determination here rests on the totality of the circumstances surrounding petitioner's maltreatment of her infant child in September 2017, and not on the resolution of any single disputed factual detail.
At the fair hearing, documentary evidence of petitioner's maltreatment included the Child Protective Services Investigation Summary, the September 8, 2017 Oral Transmittal Report in issue and the Administration for Children's Services' (ACS) Intake Records and Investigative Progress Reports (contemporaneously prepared in the ordinary course of ACS's duties). These records were admitted without objection. In partially corroborative testimony, petitioner admitted that on September 7, 2017, "for some strange reason," she retrieved her seven-month old child from a maternal aunt's home, a safe and secure residence which protected her child from potential harm, and brought her infant child to meet the infant's abusive father outside a secure, then undisclosed domestic violence shelter where petitioner had been residing. As our dissenting colleague painstakingly details, petitioner was indisputably aware of the infant's abusive father's extensive history of injurious domestic violence towards her and her other children. Moreover, an outstanding order of protection was in effect against the infant's abusive father to stay away from both. Nonetheless, petitioner and her infant child went with the infant's abusive father to his paternal great aunt's home, where a violent confrontation between them ensued, resulting in her abuser's eventual arrest. Even assuming for the sake of argument that petitioner was not holding her infant child at the precise moment the assault against her occurred, as petitioner contends, petitioner's unreasonable decision to remove her youngest child from safety and place this child in the custody and control of the infant's abusive father exposed this child to an imminent risk of serious harm and fell below the minimum degree of care required under the circumstances (see Matter of Anonymous v Poole, 162 AD3d 598, 598-599 [1st Dept 2018]). Further, petitioner's admitted violation of an existing order of protection for her child also constituted a separate and distinct finding of maltreatment because her conduct unreasonably exposed her infant to a substantial risk of harm (see Matter of Jasmine A. [Albert G.], 120 AD3d 1125, 1125 [1st Dept 2014],citing Matter of Diamond Tyneshia B. [Aisha K.], 109 AD3d 740 [1st Dept 2013], lv denied 22 NY3d 855 [2013], cert denied 574 US 845 [2014]).
Contrary to our dissenting colleague's unduly narrow focus, a finding of maltreatment does not require proof that the child was physically injured or in direct contact with the violence. Imminent risk may be established where a parent's actions foreseeably place a child in a volatile and dangerous environment (see Matter of Melanie J.A. [Ramon J.], 221 AD3d 421, 421-422 [1st Dept 2023] [domestic violence in close proximity to the child creates a reasonable inference that the child was in imminent danger of physical impairment]; Matter of Diamond Tyneshia B., 109 AD3d at 741). Thus, the ALJ reasonably concluded that petitioner's unreasonable decision to leave a confidential shelter and take her infant child to the home of her abuser's relative created precisely such a risk.
Nor does Nicholson v Scoppetta (3 NY3d 357 [2004]) compel a different result. The ALJ expressly acknowledged that petitioner had an extensive history of domestic violence at the hands of her abuser but had ample resources and options available to her (see Anonymous, 162 AD3d at 599). For instance, when her infant daughter was a few months old, petitioner's aunt, a Westchester County Police Commissioner, referred petitioner to Safe Horizon which then took both to an undisclosed domestic violence shelter, providing a bevy of support services such as domestic violence services, individual counseling, and housing assistance. Thus, when viewed through a lens of a reasonable person in similar circumstances, the ALJ properly concluded that petitioner failed to exercise a minimum degree of care (id.).
To the extent petitioner challenges the evidentiary basis for the determination, her arguments invite this Court to reweigh the evidence and reassess credibility, a function beyond the scope of substantial evidence review (see generally Matter of Berenhaus v Ward, 70 NY2d 436, 444 [1987]; Matter of Riel v State of N.Y. Off. of Children & Family Servs., 175 AD3d 1166, 1167 [1st Dept 2019]). It is also well settled that hearsay is admissible in administrative proceedings and may constitute substantial evidence where it is relevant and probative (see Matter of R.B. v New York State Off. of Children & Family Servs., 199 AD3d 429, 430-431 [1st Dept 2021]). Accordingly, the ALJ was entitled to credit the documentary evidence, portions of which were read into the record, that petitioner and her abuser "engaged in a physical altercation, both being physically aggressive toward each other, while [petitioner] was holding [the infant child] (7 months old) in her arms." Petitioner's testimony disputing certain details of the September 2017 violent altercation simply does not negate the rational basis for the determination.
Finally, although OCFS determined that petitioner's unreasonable conduct placed her infant in imminent danger, it fairly concluded that this maltreatment finding was not relevant or reasonably related to employment in childcare, adoption, or foster care. Consequently, the indicated report dated September 8, 2017, cannot be disclosed to agencies during the petitioner's application process in those fields.
All concur except Kapnick, J. who dissents in a memorandum as follows:

 KAPNICK, J. (dissenting) I respectfully dissent. I would annul the New York State Office of Children and Family Services' (OCFS) decision, dated July 28, 2023, which, after a hearing, denied petitioner Brittany W.'s request to amend and seal as "Unfounded" the September 2017 indicated report finding that she maltreated her child, C.B.
 

When reviewing the determinations of administrative tribunals, we consider whether there was "substantial evidence" to support OCFS's determination that Ms. W. maltreated her child (CPLR 7803[4]; see Matter of Charles v Poole, 164 AD3d 1148, 1149 [1st Dept 2018]). A "maltreated child" is defined as a "child less than eighteen years of age (i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent . . . to exercise a minimum degree of care" (Social Services Law § 412[2]; Family Ct Act § 1012[f]). In my view, the record here does not satisfy the substantial evidence burden, even though the standard for substantial evidence is minimal.
Ms. W. first met Mr. B. in August 2014. Thereafter, Mr. B. repeatedly beat Ms. W., confined Ms. W. against her will, confiscated her phone and belongings, and trafficked her to other men. She described Mr. B. like "an animal." As Ms. W. testified, "[i]f you fight, he's going to almost beat you to death."
In 2015, Ms. W. testified that she left her other three children with her aunt to protect them from Mr. B's violence. The Administration for Children's Services (ACS) subsequently filed a neglect petition against her. At a December 2, 2015 court appearance on the petition, Ms. W. described Mr. B.'s ongoing abuse and the presiding judge instructed her "to get [Mr. B] out of [her] household." Ms. W. testified that she "didn't have any resources to get him out" at that time. Instead, she arranged for her children to live with their father and grandmother in Orange County while she "g[ot] [her]self out of this situation."
Mr. B's abuse nevertheless continued. The violence escalated to a point that Ms. W. was hospitalized. At the hospital, a social worker advised Ms. W. to seek an order of protection against Mr. B in family court, which she did. Despite the order, Mr. B continued to terrorize Ms. W. at her apartment since he still had her keys and phone. Ms. W. testified that by this point she no longer had the "physical strength to fight him anymore" and she was in a state of "freeze-appease."
In February 2017, Ms. W. gave birth to C.B. According to her testimony, Mr. B.'s abuse worsened after C.B. was born, and became unbearable. In March 2017, Ms. W. fled into a bar to escape him. There, security protected her and contacted the police. Ms. W. notified ACS of the incident, and her aunt referred her to Safe Horizon, an organization that provides services to domestic violence victims. Shortly after, Safe Horizon placed Ms. W. in a domestic violence shelter, where she remained from March 2017 through September 2017. During this time, C.B. resided safely with Ms. W.'s aunt.
The incident giving rise to the indicated report occurred on September 7, 2017. According to Ms. W., Mr. B. called her while she was with a friend and claimed that he was standing outside the domestic violence shelter where she had been living. Ms. W. testified that Mr. B. told her that he obtained her phone number and the shelter location from his mother and another individual. Ms. W. testified that "for some strange reason," she walked to the shelter to meet Mr. B. She entered a state of appeasement, explaining that she "couldn't fight" and "just went with him." Once they met, Mr. B. "demanded that [Ms. W.] get C.B. and bring her with — with [them] to his aunt's house." At Mr. B.'s demand, she retrieved C.B. and accompanied him to his aunt's home.
At the aunt's house, Mr. B. became violent with Ms. W. He pushed her inside a bathtub and down a flight of steps and then repeatedly punched her in the face. Ms. W. testified that C.B. was still in Mr. B.'s aunt's home during the assault, while she and Mr. B. were outside "in front of [the aunt's front] door."
Ms. W. recalls that she and Mr. B. left his aunt's home and ended up in Manhattan where she sought hospital treatment. Mr. B. was then arrested.
The following day, an undisclosed individual [FN1] called in a report to the Statewide Central Register (SCR) concerning the incident. ACS investigated and indicated the report against Ms. W. on November 7, 2017.
Ms. W. entered treatment and counseling to address the abuse she endured. She learned that she had been experiencing Stockholm syndrome and PTSD, which placed her "in a state of freeze" during the relevant events. Ms. W. resumed living with her children following treatment. She is currently employed as a Home Health Aide and aspires to become a domestic violence advocate and lawyer. In March 2020, Ms. W. was notified that a prospective employer had inquired of OCFS whether she was on the SCR as a person responsible for child abuse or maltreatment. Ms. W. requested a hearing to challenge the indicated report.
At the OCFS hearing, ACS relied exclusively on documentary evidence, which it is permitted to do, including the Oral Transmittal Report (OTR) dated September 8, 2017, the 2017 CPS Investigation Summary, and ACS's 2017 Investigation Progress Notes. ACS did not call any witnesses to testify. ACS argued that this documentary evidence established by a fair preponderance of the evidence that Ms. W. failed to provide adequate guardianship for C.B. in 2017. Ms. W. also submitted documentary evidence, including certificates showing that she completed a domestic violence intervention program and parenting classes. Ms. W. was the only witness to testify at the hearing and presented unrebutted testimony concerning the abuse she suffered, her psychological state at the time, and the steps she took to protect her children.
On this record, I disagree with the majority's holding that substantial evidence supported OCFS's determination that Ms. W.'s conduct placed C.B. in actual or imminent danger of impairment (see Matter of Poole, 164 AD3d at 1149 ["OCFS's determination that child maltreatment by petitioners was 'indicated' is not supported by substantial evidence"]; Matter of Parker v CarriÓn, 80 AD3d 458, 459 [1st Dept 2011] ["We conclude on the record before us that the administrative determination that petitioner neglected her daughter by the use of excessive corporal punishment was not supported by substantial evidence"]). OCFS determined that "[t]he Appellant's actions placed C.B. at imminent risk of severe physical impairment" based on its finding that Ms. W. "engaged in a physical altercation with Mr. B. while holding C.B." However, the only document that ACS admitted into evidence to support this conclusion was a call narrative in an OTR from an undisclosed third-party who stated that Ms. W. was "holding C.B. (7 months old) in her arms" when Mr. B. attacked her.[FN2] The call narrative was not read into the record during the hearing, and neither the undisclosed caller nor the caseworker who transcribed the call and wrote the report testified at the hearing.
This Court has found that while it is proper "to rely on hearsay evidence that is relevant and probative," such hearsay "d[oes] not constitute substantial evidence of child maltreatment" where it is "controverted by petitioner's sworn testimony, which was subject to cross-examination" (Matter of Veronica C. v CarriÓn, 55 AD3d 411, 412, [1st Dept 2008]; see also Matter of Gerald HH. v CarriÓn, 130 AD3d 1174, 1176 [3d Dept 2015] ["Hearsay evidence will not satisfy (the substantial evidence) standard if the facts it purportedly establishes are 'seriously controverted'"]).
Here, the OTR call narrative stating that Ms. W. was holding C.B. during the assault contradicts Ms. W.'s sworn testimony that Mr. B. beat her "in front of [his aunt's] door," while C.B. "was still in [Mr. B's aunt's] . . . home." This testimony refutes the undisclosed caller's narrative, which suggested that C.B. was in Ms. W.'s arms while Mr. B. attacked her. OCFS's decision to credit the undisclosed caller's statement in the OTR over Ms. W.'s sworn testimony was also improper because the caller's "credibility could not be assessed" on cross-examination (see Matter of McGillicuddy's Tap House, Ltd. v New York State Liq. Auth., 57 AD3d 1052, 1054 [3d Dept 2008] ["the Administrative Law Judge's decision to credit (a hearsay) account was improper because (the witness's) credibility could not be assessed"]).More troubling, the undisclosed caller's narrative of events is controverted by other evidence in the record (see Matter of Gerald HH., 130 AD3d at 1176 [holding that "substantial evidence does not support the challenged determination" because "[s]erious controversy is precisely what surrounds the hearsay evidence"]). ACS introduced into evidence Investigation Progress Notes containing a subsequent interview with the source of the initial OTR. Notably, the undisclosed source did not make the same allegation that Ms. W. was holding C.B. when Mr. B. attacked her. Other witnesses' description of the brutal attack [FN3] also undermine any possibility that Ms. W. could have been holding C.B., who remained unharmed.[FN4]
The majority's finding that Ms. W. exposed C.B. to an imminent risk of harm when she complied with Mr. B.'s demand to bring C.B. to his aunt's house because she knew he was abusive is unsupported. The majority cites to Matter of Anonymous v Poole, but that case is distinguishable because it involved a mother who maltreated her son "when during a domestic dispute she drove down the street with the child who was being held by the father, on top of her vehicle's hood" (162 AD3d 598, 598 [1st Dept 2018]). Matter of Melanie J.A. (Ramon J.), is also distinguishable because there, this Court affirmed a finding of neglect against the abusive father based on his "repeated acts of domestic violence committed . . . against the mother" (221 AD3d 421, 421 [1st Dept 2023]). Indeed, there was no finding of neglect or maltreatment against the mother in that case.
OCFS's imminent risk finding rests exclusively on hearsay that is neither reliable nor probative considering the record as a whole. I would therefore find that OCFS's determination that Ms. W.'s actions placed C.B. in "imminent risk of severe impairment" was not supported by substantial evidence.
The majority's conclusion that Ms. W. failed to exercise a minimum degree of care under Nicholson v Scoppetta (3 NY3d 357 [2004]), is also belied by the record. OCFS failed to adequately consider Ms. W.'s longstanding history of abuse when it determined that her conduct fell below the minimum degree of care required of a parent "under the circumstances then and there existing" (id. at 370). In Nicholson, the Court of Appeals held that evidence that a parent allowed a child to witness domestic abuse against them is insufficient, without more, to satisfy the neglect standard under Family Court Act, article 10 (3 NY3d at 368). The Court found that "[a]ssuming that actual or imminent danger to the child has been shown, 'neglect' also requires proof of the parent's failure to exercise a minimum degree of care . . . not maximum, not best, not ideal. . . ." (id. at 370, citing Matter of Hofbauer, 47 NY2d 648, 656 [1979]). Where, as here, the mother is a domestic violence survivor, the inquiry is whether she "failed to exercise a minimum degree of care, [and] the focus must be on whether she has met the standard of the reasonable and prudent person in similar circumstances" (id. at 370-371). The Court noted specific factors that should be considered in the neglect analysis, including:
risks attendant to leaving, if the batterer has threatened to kill her if she does; risks attendant to staying and suffering continued abuse; risks attendant to seeking assistance through government channels, potentially increasing the danger to herself and her children; risks attendant to criminal prosecution against the abuser; and risks attendant to relocation. Whether a particular mother in these circumstances has actually failed to exercise a minimum degree of care is necessarily dependent on facts such as the severity and frequency of the violence, and the resources and options available to her (id. at 371).
Courts applying Nicholson to neglect proceedings have rejected "a presumption of neglect where a parent had allowed a child to witness domestic violence, holding that this bare allegation did not meet the Family Court Act's requirements" (Matter of Afton C. [James C.], 17 NY3d 1, 10 [2011]; see also Matter of Eustace B. [Shondella M.], 76 AD3d 428, 429 [1st Dept 2010]; Matter of Elizabeth B. v New York State Off. of Child. & Fam. Servs., 149 AD3d 8, 12 [3d Dept 2017]; Matter of Chaim R. [Keturah Ponce R.], 94 AD3d 1127, 1130 [2d Dept 2012]; Matter of Ilona H. [Elton H.], 93 AD3d 1165, 1166-1167 [4th Dept 2012]; Matter of Ravern H., 15 AD3d 991, 992 [4th Dept 2005], lv denied 4 NY3d 709 [2005]). Indeed, in Matter of R.C. (D.C.—R.R.) (240 AD3d 33 [1st Dept 2025]), this Court noted that a neglect petition against a mother who allegedly failed to enforce an order of protection against the father before he punched her in the child's presence was dismissed because it was "directly contrary to" Nicholson (id. at 35 n 2).
In contravention of Nicholson and its progeny, OCFS found that Ms. W. maltreated C.B. "when she left the secure undisclosed domestic violence shelter, remov[ed] the child from safety, and t[ook] her to stay with Mr. B., her known abuser, at one of his family member's houses, where she subsequently was physically assaulted by Mr. B., while holding infant C.B." OCFS failed to consider Ms. W.'s detailed testimony concerning how Mr. B.'s longtime abuse impacted her on the day he appeared unexpectedly at the domestic violence shelter. For years, Ms. W. endured horrific acts of violence perpetrated by Mr. B. After Ms. W. finally severed contact with Mr. B. and escaped to a domestic violence shelter for seven months, Mr. B. showed up "in front of" the shelter without warning. Ms. W.'s testimony established that fighting Mr. B. after she tried to escape had historically only placed her at more serious risk of harm. She described numerous times when she had tried to leave Mr. B., only to be beaten by him as retribution. OCFS did not analyze this cycle of abuse in its decision, even though it acknowledged that Mr. B. had exerted enormous power and control over Ms. W. for years.
On September 7, 2017, Ms. W. learned that Mr. B. had found her at the domestic violence shelter. She testified that she retreated into a state of appeasement, consistent with prior incidents when Mr. B. abused her, and "[she] couldn't fight" him. She therefore acquiesced to Mr. B.'s "demand[] that [she] get C.B. and bring her with . . . [them] to his aunt's house." Given Mr. B.'s documented history of violence, Ms. W. reasonably believed that refusing his demands would place her and her children at a heightened risk of serious harm, as it had numerous times before. [FN5] Nicholson demands that courts analyze the risks Ms. W. faced if she resisted Mr. B.'s demands when determining whether she exercised the minimum degree of care under the circumstances. I do not agree that OCFS did so here.[FN6]
The majority overstates the significance of Ms. W.'s "violation of an existing order of protection." Setting aside that Ms. W. cannot violate an order of protection that was entered to protect both her and her child (Family Ct Act § 842),[FN7] OCFS's determination was not based on Ms. W.'s failure to enforce an order of protection against Mr. B. In addition, Matter of Jasmine A. (Albert G.) (120 AD3d 1125, 1125 [1st Dept 2014])and Matter of Diamond Tyneshia B. (Aisha K.) (109 AD3d 740 [1st Dept 2013], lv denied 22 NY3d 855 [2013], cert denied 574 US 845 [2014]) are inapposite. Unlike in those cases, Ms. W. did not allow Mr. B. back into her home; rather, Mr. B. found her at a domestic violence shelter, the location of which was supposed to remain confidential but no longer was, and compelled her to comply with his demands after years of prolonged abuse. 
Moreover, the majority places significant emphasis on OCFS's finding that Ms. W. "had ample resources and options available to her" when Mr. B. appeared at the shelter on September 7, 2017. This finding essentially ignores the complicated history surrounding Mr. B.'s violence towards Ms. W., as described above. It also ignores Ms. W.'s prior unsuccessful efforts to access external resources, which only placed her in more danger. She testified that she obtained an order of protection against Mr. B., but he ignored the order, forced her to sleep in her hallway because he had her keys, and then took her to California where she was beaten and forced into homelessness.
These factors, coupled with the absence of substantial evidence that Ms. W. was holding C.B. at the time she was beaten, illustrate that Ms. W. exercised the minimum degree of care of a reasonably prudent parent who had been a longstanding survivor of domestic abuse. To hold otherwise would contravene the principles articulated over twenty years ago by Chief Judge Kaye in Nicholson by effectively penalizing Ms. W. for her status as a survivor of domestic violence and for the incidental exposure of her child to that abuse.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: February 17, 2026

Footnotes

Footnote 1: The identity of sources who report suspected child abuse or maltreatment to SCR is confidential (Social Services Law § 422[4][A]), but the record indicates that the source lives in the same home as Mr. B.'s aunt.

Footnote 2: The ACS Investigation Progress Notes include a duplicate report that originated from an undisclosed third party and was subsequently sent by the police to SCR. The narrative says that an aunt and uncle "took C.B. from the mother's arms and removed the child from the situation." The OTR from the police's call to SCR was not admitted into evidence or included in the record.

Footnote 3: For instance, the undisclosed source said that Mr. B. "punched [Ms. W.] in the face" and "dragg[ed] [Ms. W.] by her hair." Ms. W. testified that she was beaten so badly that her "eyes were swollen shut."

Footnote 4: The majority's reliance on Matter of R.B. v New York State Off. of Children & Family Servs., does not convince me that the evidence submitted by ACS to support a maltreatment finding here was sufficiently substantial (199 AD3d 429, 430-431 [1st Dept 2021]). That case involved far more detailed documentary evidence than ACS introduced here, including ACS investigation notes, ACS caseworker testimony, and medical records that included "detailed descriptions by the child" who experienced sexual abuse.

Footnote 5: The State argues that these risks "do not apply here" because "[Ms.] W. had already left [Mr. B.] and was in a safe location when they spoke over the phone." This argument disregards Ms. W.'s testimony that she went through a stage of "appease[ment]" when Mr. B. called her unexpectedly, which was consistent with her reaction to his prior abuse.

Footnote 6: The undisclosed source who reported to SCR provided a different sequence of events than Ms. W. in their interview with ACS. They said that Ms. W. had stayed at Mr. B.'s great aunt's home two nights before, Mr. B. and Ms. W. were "trying to work things out," and Ms. W. was "going to go to Court to drop the Order of Protection against [Mr. B]." However, these statements appear to be based on information provided to the source by Mr. B. and therefore cannot be credited given that he is Ms. W.'s abuser (["Mr. B. reported to the source. . . ."]; ["during an interview with Mr. B. he informed CPS that Ms. W. contacted him"]). Moreover, ACS did not cross-examine Ms. W. on her account of September 7, and the documents admitted into evidence by ACS do not contradict Ms. W.'s testimony concerning her past abuse and the influence that Mr. B. had over her on that day.

Footnote 7: Family Ct Act § 842 states that: "The protected party in whose favor the order of protection or temporary order of protection is issued may not be held to violate an order issued in his or her favor nor may such protected party be arrested for violating such order."